**In re D.A.T., a Minor.**

**Appeal of R.T.**

Superior Court of Pennsylvania.

Submitted Jan. 6, 2014.
Filed April 29, 2014.

Raymond N. Sanchas, Pittsburgh, for appellant.

Amy L. Berecek, Pittsburgh, for appellee.

Diann R.S. McKay, Pittsburgh, for Allegheny County Children and Youth, participating party.

BEFORE: FORD ELLIOTT, P.J.E., BOWES, J., and WECHT, J.

OPINION BY WECHT, J.:

R.T. ("Mother") appeals from the August 23, 2013 order that terminated her parental rights to her son, D.A.T. ("Child"). After review, we affirm.

The trial court has provided us a very thorough and detailed review of the facts that it found in this case:

[Child] was born [in August 2011]. [Child] was removed from Mother's care a few days later on September 3, 2011. To better appreciate the conditions that caused the Court to order [Allegheny County Office of Children, Youth, and Families ("CYF")] to remove [Child], it is first necessary to discuss Mother's history with the agency regarding [Child's] older brother J.T.

On October 15, 2010, CYF received a referral from Magee Hospital regarding Mother and her then newborn son J.T.

In January 2010, Mother tested positive for an infectious disease.[1] Though [Mother] was made aware that if she took prophylactic medication during her pregnancy, she would likely prevent transmission of the virus to the unborn J.T.; Mother refused to take such medication.[2]

[2] At J.T.'s adjudication hearing, the Court heard credible testimony from Dr. Squires that when infected mothers receive prenatal prophylactic medication, the transmission rate between the mother and the child is only 5%. [The notes of testimony from J.T.'s and Child's adjudication hearings were admitted as exhibits in the termination of parental rights hearing.]

Records and testimony from J.T.'s adjudication hearing indicated that Mother received little prenatal care. While J.T. appeared healthy at birth, it is not possible to detect whether the virus was transmitted from mother to newborn for several weeks. Mother was sent home with medications that were necessary for the baby to prevent life-threatening infection. Before or immediately after her discharge, CYF met with Mother to ensure that she knew how to administer the baby's medication. However, when CYF attempted to do a home-visit on October 18, 19, and 20 of 2010, the agency could not make contact with Mother. CYF later learned that the address CYF used was that of Mother's great-aunt. Mother's great-aunt would not cooperate with the assessment. On November 4, 2010, Mother met with [CYF] at their office.

After her discharge on October 17, 2010, the hospital reportedly stressed that Mother must bring J.T. back to the hospital for weekly appointments until a diagnosis [could] be made. Mother brought J.T. to two follow-up appointments on October 29, 2010 and on November 4, 2010. The following day, on November 5, 2010, the test confirmed that J.T. was also positive for the infectious disease. The hospital made repeated attempts to contact Mother in order to inform her that the baby was in vital need of medication to prevent a life-threatening illness. The hospital made numerous phone calls, attempted contact via certified mail and turned to CYF and the Wilkinsburg Police department in its effort to locate the child. Mother later testified that she was staying at the house of friend M.T. (no relation). After November 4, 2010, Mother had no contact with CYF until December 27, 2010 after J.T.'s shelter hearing. J.T. was without necessary medical treatment until Mother took him to the hospital on December 24, 2010. At the hospital, J.T. received a necessary blood transfusion. J.T. was placed on December 28, 2010 after being discharged from the hospital.

During the ensuing months in which J.T. was dependent in care, Mother began to have contact with CYF. At some point after the removal of J.T., Mother became pregnant with Child. She continuously denied to the CYF caseworker that she was pregnant. As was the case with J.T., Mother did not receive either prenatal care or the vital prophylactic medication that significantly reduces a child's chances of contracting the infectious disease from the mother. The record is unclear whether [Child] was born premature, but CYF learned of the child

1. The record indicates that the infectious disease referred to in testimony is H.I.V. Notes of Testimony, 8/22/2013, at 10.

only after Mother had given birth when the baby was in the NICU.[4]

[4] CYF attempted to identify [Child's] father. Mother initially identified M.T., but a DNA test ruled him out on February 20, 2012. Mother told CYF that another possible father could be a man named Larry, but because the last name was unknown, CYF could not locate him. Mother stated that other possible fathers were named G.Tuc. also known as G.Tur. CYF contacted a man named G.Tu., but he refused to meet with the agency.

At this point, Mother was still without permanent housing. Mother had not been cooperative with CYF, nor the service providers regarding the J.T. case. For those reasons, and because Mother had a history of refusing the necessary medication to treat J.T.'s infectious disease, CYF requested an Emergency Custody Authorization ("ECA"). Following the ECA on September 3, 3011, [Child] was placed in the care of D.W. [in a foster placement] until October 11, 2012. Since October 11, 2012, both children have resided in the Three Rivers Adoption home of J.R. and C.R., where they have remained. After [Child's] placement, he was given proper medication from birth, and after a round of testing it was determined that [Child] is negative.

At the time of [Child's] birth, Mother was already involved with CYF pertaining to J.T.'s case. The agency created a Family Service Plan ("FSP") with Mother whereby she would achieve goals and address CYF's concerns. Mother's initial FSP was created on January 26, 2011. The FSP's goals were the following: obtain preventative health and dental care; visitation with J.T.; cooperation with both CYF and the service providers; obtain housing; and stabilize mental health. The objective was to reunify Mother with her children.

Mother had limited success with the FSP. The housing goal was achieved in October 2011. Mother also achieved her visitation goal, though CYF noted that she was argumentative with the staff who supervised those visits. Mother completed the parenting goal through the Arsenal parenting program. However, for reasons pertaining to her mental health and functioning, mere completion of the Arsenal program did not result in improved parenting skills. The remaining goals were not achieved.

Mother demonstrated a fairly consistent lack of cooperation with both CYF and the service providers. Mother refused to meet with Family Group Decision-making workers, who would connect Mother to family and supportive community services. These services were thus only given from January 2011 to February 2011. Following an interview with [psychologist Dr. Patricia Pepe], CYF recommended that Mother work with in-home service providers Project Star and Achieva to address the parenting concern. Project Star services were initiated on February 23, 2011, but were cancelled two months later because of Mother's stated refusal that she did not want to work with them, but rather with another program. In one instance, the service provider resorted to trying to meet with [Mother] during a supervised visit. Mother began to record the worker on her phone because she so greatly distrusted the service worker. In response to that cessation of services, CYF initiated services with Achieva on November 1, 2011. Those services too were stopped on February 24, 2012, because of a lack of cooperation.[6]

[6] A second referral to Achieva was made on August 20, 2012, but the provider was not willing to accept Mother unto the program due to her previous lack of cooperation.

Mother's lack of cooperation with Achieva was particularly worrisome to the Court. Achieva is a service that

works with parents who have a diagnosis of Mental Retardation. It can provide extensive services. A worker is assigned to help parents with disabilities, whereby the worker teaches them daily living and parenting skills. The worker also helps a parent in understanding the medical needs of both parent and child. Dr. Pepe conducted two evaluations with Mother and two interactional evaluations with Mother and children. The interviews were conducted [from] March 31, 2011 until May 2013. Dr. Pepe testified that while Mother appears to understand what she is being told, she does not, in fact, understand what is going on. Mother's IQ test revealed that she is functioning in the mild range of mental retardation. She is on Social Security for her learning difficulties. Mother also demonstrated a communication disorder. Mother also has a fairly low global assessment score, which also seeks to measure a person[']s daily functioning. Dr. Pepe also conducted the Vineland Adaptive Behavior Scale to assess the functioning of an individual regarding her communication, socialization and daily living skills. The result of that test indicated a high probability that Mother has already reached her fullest functioning potential.

Dr. Pepe also testified that Mother has a basic distrust of authority and services. Dr. Pepe stated that doctors and physicians should be included as authority figures and service providers. In fact, when Dr. Pepe spoke with Mother regarding her lack of compliance with managing her medical issues, Mother became very upset and accused Dr. Pepe of being "on the side of the judge and the caseworker." Only after Dr. Pepe called Mother's attorney in the hope that he might convince her to cooperate with the evaluation, did Mother begin to comply. Though that coopera-

tion, too, was short-lived. Mother has already demonstrated a history of refusing to cooperate with those who seek to provide care to both Mother and her children.

At the request of her counsel, [on August 20, 2012,] Mother was appointed a guardian *ad litem* ("GAL"). Specifically, the GAL was appointed to assess whether Mother understood the nature of the Court's proceedings and to help Mother understand the necessity of certain requests such as signing medical releases. Mother was instructed to sign medical releases so that CYF could better understand her learning disabilities and to determine whether she was treating her own infectious disease. However, Mother refused to sign any of these releases. Mother was also combative and argumentative when the GAL sought to obtain information from her. In fact, Mother refused to return the GAL's phone calls and messages. When the GAL appeared at Mother's hearing on November 2, 2012, Mother refused to talk to the GAL or schedule a future meeting. The GAL and Mother eventually met when the GAL showed up at the CYF office during Mother's arranged visitation with her children. The GAL sought to coordinate another opportunity for Mother to work with Achieva, but Mother refused to pursue that avenue. In her assessment, the GAL stated that she believed Mother is capable of understanding the legal proceedings, but that she is suspicious and very angry with the legal system for taking her children away. Because the GAL believes that Mother was capable of aiding her attorney in litigating her case, and because Mother refused to communicate or work with the GAL, the GAL stated that she [did] not believe Mother was open to her help or involvement. For those reasons,

the GAL sought to withdraw and the Court granted leave.

While Mother testified during a recent review hearing that she had seen a doctor, Mother did not provide documentation. CYF could not verify whether the treatment was on-going or whether Mother was even in good health. Consequently, the mental health goal was not completed. CYF attempted to arrange a meeting between Mother and a nurse at UPMC so that she might come to understand her own medical needs. However, Mother did not participate past the original meeting. Whether Mother's refusal to address CYF's concerns is due to her lack of cooperation, her lack of comprehension, or both, Mother has caused [Child] to be without essential parental care necessary for his well-being.

\* \* \*

Dr. Pepe testified that because of Mother's developmental disabilities, she has demonstrated a lack of understanding, difficulty with communication, a lack of trust, a lack of comprehension, and an inability to appreciate the magnitude of importance related to the medical issues. Mother utilizes defensive mechanisms such as denial and projection and has a great difficulty in taking responsibility for her own actions. Such difficulties affect Mother's ability to parent even a healthy child.

For instance, during one interactional evaluation between Mother and [Child], Dr. Pepe observed that Mother was encouraging [Child] to play with the board games in Dr. Pepe's office. The problem was that Mother failed to appreciate how dangerous the small Monopoly pieces could be for a toddler like [Child]. Dr. Pepe testified that Mother did not understand the safety issue until it was pointed out to her. In other instances, even when Mother is aware of safety or health needs of her children, there are concerns that she is so passive about the situation, that she or the children are put in harm's way. When the topic of J.T.'s medical condition arose, Mother stated that his well-being was "in God's hands." Of course, such a phrase might only reflect a belief in God, which does not necessarily show that the declarant would abstain from seeking medical attention. However, Dr. Pepe stated that such an answer might also reveal that the parent will not take affirmative steps to insure that medical care is being provided.

For example, foster mother C.R., a registered nurse, testified that while the risk of transmitting the disease is pretty low in a home setting, precautions must still be taken. Everywhere J.T. goes, foster mother takes a first aid kit. Whenever J.T. has a skinned knee, or a bloody nose, foster mother dresses the wound and scrubs the surrounding physical space with bleach in order to kill the virus. The entire family gets flu shots, because J.T.'s immune system is low. It is all the more important to practice a healthy lifestyle. There is serious doubt as to whether Mother could take these precautions for herself if [Child] was eventually returned to her care. In fact, there is a serious question as to whether Mother would even appreciate the fact that such precautions should be taken. Dr. Pepe testified that while Mother was patient and attentive, she does not have an appropriate level of understanding regarding what was developmentally appropriate with the children.

Trial Court Opinion ("T.C.O."), 10/18/2013, at 3–9 (citations to record omitted, some footnotes omitted).

As noted above, Child was placed in CYF care on September 3, 2011 and the

court adjudicated Child dependent on September 12, 2011. On January 8, 2013, a petition for involuntary termination of Mother's parental rights was filed. On August 22, 2013, the court heard testimony on the termination petition. On August 23, 2013, the court terminated the parental rights of Mother pursuant to 23 Pa.C.S.A. § 2511(a)(2), (a)(5), (a)(8), and (b).

On September 20, 2013, Mother filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The court filed its Rule 1925(a) opinion.

Mother raises the following issues for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 5.

■ The standard and scope of review applicable in termination of parental rights cases are as follows:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that it would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super.2004) (*en banc*) (internal citations omitted).

Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super.2002) (internal citations omitted). "The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super.2002). If the trial court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support the opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191 (Pa.Super.2004).

This Court has explained the proper analysis for a termination petition, as follows:

[U]nder Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only after determining that the parent's conduct warrants termination of his or her parental

rights must the court engage in the second part of the analysis: determination of the needs and welfare of the child under the standard of best interests of the child. Although a needs and welfare analysis is mandated by the statute, it is distinct from and not relevant to a determination of whether the parent's conduct justifies termination of parental rights under the statute. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child.

*In re Adoption of C.L.G.*, 956 A.2d 999, 1004 (Pa.Super.2008) (*en banc*) (citations omitted).

Mother has raised a claim of error as to both parts of section 2511. Section 2511 of the Adoption Act provides in pertinent part:

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(a), (b).

"[W]e need only agree with [a trial court's] decision as to any one subsection [of 2511(a), along with 2511(b),] in order to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super.2004) (*en banc*). Therefore, we focus our inquiry upon the trial court's analysis under subsection 2511(a)(8).

To terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the

date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. Section 2511(a)(8) sets a 12–month time frame for a parent to remedy the conditions that led to the [child's] removal by the court. Once the 12–month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of [the child welfare agency] supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of [the child welfare agency's] services.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa.Super.2008) (citations omitted).

Regarding the "needs and welfare" analysis pertinent to sections 2511(a)(8) and (b), we have observed as follows:

[I]nitially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. However, Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the "developmental, physical and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court "engage in the second part of the analysis pursuant to Section 2511(b): deter-

mination of the needs and welfare of the child under the standard of best interests of the child." Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re C.L.G.*, 956 A.2d 999, 1008–09 (Pa.Super.2008) (*en banc*) (citations omitted).

In her first issue, Mother argues that, in order for her rights to be terminated under section 2511(a)(8), CYF was required to prove that all of the conditions that led to Child's removal are still present. Mother contends that the statute must be strictly construed and that the phrase "the conditions" should be construed to mean "all of the conditions" rather than "some of the conditions." Mother also argues that the evidence showed that she had a loving bond with Child and that it was not in Child's best interest to sever that bond. Mother's Brief at 16–17.

■ Mother concedes that the first element of section 2511(a)(8) has been met, as Child has been in foster placement for more than twelve months. Mother's argument as to the second element, "the conditions which led to the removal or placement of the child continue to exist," is based upon her interpretation of the statute. However, Mother provides no decisional authority to support her view that all of the conditions at the time of dependency must continue to exist at the termination hearing. To the contrary, this Court has held that, where a parent has addressed some of the conditions that led to a child's removal, but other conditions still exist, this element may be deemed to

be satisfied. *See In re C.L.G.*, 956 A.2d 999, 1005 (Pa.Super.2008) (*en banc*) ("[A]lthough Mother exhibited substantial progress in meeting the Agency's objectives, she ultimately was unable to care for C.L.G. because, twelve months later, she could not provide the requisite parenting and adequate housing."); *In re S.H.*, 879 A.2d 802, 806 (Pa.Super.2005) (holding mother made significant progress as to certain conditions, but conditions that led to removal continued to exist).

One of Mother's FSP goals was to cooperate with CYF and service providers. The trial court found that Mother failed to meet this goal. Mother was discharged due to lack of cooperation from Project Star and Achieva, both service providers that would have worked with Mother on her parenting skills. Achieva's program is designed specifically to aid parents with mental and developmental disabilities, so Mother's refusal to participate in that program was particularly detrimental to her ability to care for Child. Mother also refused to cooperate with Family Group Decision Making, which would have assisted Mother with finding family and community support and services. Similarly, Mother's determined refusal to work with the GAL demonstrates that she had not met this goal.

Another goal was to stabilize Mother's mental health. Dr. Pepe testified to Mother's low global assessment and corresponding difficulty with daily functioning. Mother has shown a distrust of the physicians, caseworkers, and service providers who have attempted to assist her. Mother has not provided any documentation of attendance at her own medical appointments. She also has not participated in the follow-up meetings with a nurse to help Mother address her own medical needs. Mother has not attended mental health treatment, and has refused to sign medical releases. Notes of Testimony ("N.T."), 8/22/2013, at 53–54. Dr. Pepe testified that, due to Mother's developmental disabilities, Mother would be hard-pressed to parent any child. Mother had difficulty recognizing safety concerns. This is a particular problem in this case because, if Mother had custody of Child, Mother would have to take additional precautions and implement additional safety measures to ensure that her infectious disease is not transmitted to Child.[2]

Mother made progress toward some of her goals. She obtained housing and participated in visitation with Child. She completed a parenting program. Unfortunately, that program did not have its intended effect. The caseworker testified that Mother completed the program with J.T. and then again with both children, but was unable to demonstrate the skills learned in the program during her visits with the children. N.T. at 46. Based upon the record developed, the conditions that led to Child being in placement still existed at the time of the hearing. Thus, the trial court did not abuse its discretion in concluding as follows:

> This Court finds that Mother's mental capacity limits her ability to understand or appreciate the needs of [Child]. Because of her lack of cooperation, whether this is due to her lack of comprehension or otherwise, Mother is unable to remedy the safety concerns that necessitated [Child's] removal and placement. As

---

**2.** *See* T.C.O. at 9 (detailing precautions taken by foster family to prevent transmission of virus from J.T. to others, including carrying a first aid kit at all times, dressing wounds and scrubbing surrounding area with bleach when J.T. is injured, and getting flu shots and practicing healthy habits to protect J.T.'s immune system).

such, her ability to parent is severely impaired.

T.C.O. at 9–10.

■■■ Finally, for the third prong of section 2511(a)(8), CYF was required to prove that termination serves the needs and welfare of Child. With regard to the needs and welfare of Child, the trial court made the following findings:

> Removed from Mother's care just three days after his birth, [Child] has never been in the care of Mother. Since October 11, 2012, [Child] has resided with his pre-adoptive foster parents C.R., a registered nurse, and J.R., a special education teacher. In addition to his older brother, J.T., foster parents have three daughters, aged 12, 9, and 7. [Child] refers to his foster parents as "Mommy and Daddy." Their respective occupations have allowed the child to enhance his developmental functioning. The foster parents meet his needs, and [Child] has developed a primary attachment to them.

> This Court notes that Mother's testimony revealed that she clearly loves her children. Dr. Pepe testified that she was impressed that [Child] showed a bond with Mother despite never being in her care. Further testimony revealed that Mother has a kind presence and is encouraging toward the children. [Child] recognizes Mother, and Dr. Pepe testified that the child will probably miss her to some degree. However, Dr. Pepe also testified that Mother is unable to meet [Child's] overall psychological and physical needs on her own.

*Id.* at 10 (citations to record omitted).

Our review of the record shows that the trial court's findings and conclusions are supported. There was no abuse of discretion in concluding that termination of parental rights would best serve Child's needs pursuant to section 2511(a)(8). Finding no error in the trial court's conclusion that all conditions of section 2511(a)(8) have been proven by clear and convincing evidence, we turn to Mother's second and final issue on appeal.

■■■ In that issue, Mother challenges the trial court's finding that termination of her parental rights would best serve "the developmental, physical and emotional needs and welfare of" Child pursuant to section 2511(b). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super.2005) (citation omitted). The trial court also must consider the nature and status of the parent-child bond, particularly the effect upon the child of permanently severing that bond. *Id.*

■■■ The court may prioritize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d 753, 763 (Pa.Super.2008) (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa.Super.2004) (internal citations omitted).

Mother argues that Dr. Pepe found that Child had a bond with Mother and was impressed that Mother was able to develop a bond with Child notwithstanding the fact that Mother and Child never lived together. Mother also contends that Dr. Pepe found Mother "has a very kind of a soft presence with [Child] that is encouraging towards [Child]." N.T. at 109. Mother

argues that this relationship and the bond she has with Child prove that it is not in Child's best interest to terminate her parental rights. Mother's Brief at 19–21.

As noted in the discussion of subsection (a)(8), the testimony demonstrated that Child's primary bond is with his foster parents. While Child also has a bond with Mother, it is of such a nature that its severance would not cause Child undue dismay. Child's main sources of love, comfort, stability and security are his foster parents, not Mother. Further, Mother is not able to meet Child's emotional, physical, and developmental needs, or to provide Child with a healthy, safe environment, and had not been able to do so for almost two years prior to the termination hearing. For all these reasons, CYF met its burden by clear and convincing evidence. The trial court did not err or abuse its discretion in so finding.

Order affirmed.