J-S32033-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.E.C.-B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: N.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2051 EDA 2016 |

Appeal from the Decree and Order June 7, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  51-FN-000269-2014,
CP-51-AP-0000453-2016


| | | |
|---|---|---|
| IN THE INTEREST OF: S.M.C.-B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: N.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2053 EDA 2016 |

Appeal from the Decree and Order June 7, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  51-FN-000269-2014,
CP-51-AP-0000455-2016

| IN THE INTEREST OF: S.D.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2054 EDA 2016 |

Appeal from the Decree and Order June 7, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): 51-FN-000269-2014,
CP-51-AP-0000456-2016

BEFORE: GANTMAN, P.J., STABILE, and FITZGERALD[*], JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED JUNE 30, 2017**

Appellant, N.C. ("Mother"), appeals from the decrees and orders involuntarily terminating her parental rights to S.E.C.-B. (born in March of 2011), S.M.C.-B. (born in January of 2012), and S.D.C. (born in January of 2014) (collectively "Children") pursuant to the Adoption Act, 23 Pa.C.S. § 2511 (a)(1), (2), (5), (8), and (b), and changing Children's permanency goals to adoption under the Juvenile Act, 42 Pa.C.S. § 6351.[1] We affirm the decrees of termination in part and vacate in part and vacate the orders changing Children's permanency goals pending further proceedings.

---

[*] Former Justice specially assigned to the Superior Court.

[1] In separate decrees and orders entered on June 7, 2016, the trial court involuntarily terminated the parental rights of biological father, M.B. ("Father"). Father, represented by counsel, failed to appear at the hearing. Father is not a party to the current appeal, nor did he file a separate appeal.

The Department of Human Services of Philadelphia County ("DHS") became involved in January of 2014, after receiving a General Protective Services ("GPS") report that Mother, who was the primary caregiver of S.E.C.-B. and S.M.C.-B., gave birth to S.D.C. in a bathtub at home. The GPS report further alleged that Mother contacted a friend, who took the newborn baby to the hospital because Mother did not want to take care of S.D.C. DHS also learned that Mother and Children resided in the home of Children's maternal grandfather, D.N. ("Maternal Grandfather"). Maternal Grandfather was unaware that Mother was pregnant or that she gave birth to S.D.C. in the bathtub. On February 4, 2014, DHS obtained an order of protective custody for S.D.C. and developed a safety plan for Mother and Maternal Grandfather. Under the safety plan, Mother agreed to leave Maternal Grandfather's residence and have Children placed in Maternal Grandfather's care.

The trial court adjudicated S.D.C. dependent on March 17, 2014. S.E.C.-B. and S.M.C.-B. were adjudicated dependent on April 28, 2014. On November 4, 2014, Mother participated in a parenting capacity evaluation with William Russell, Ph.D., ("Dr. Russell") at Assessment and Treatment Alternatives. Dr. Russell authored a report, the conclusions of which he described as follows:

> I think the biggest concern was her rather concrete thinking, her immaturity, her problem with what I call anticipatory thinking -- that is thinking ahead -- and how she rationalized the risky behaviors all combined to create

a problem with judgment; that hiding the pregnancy from her father because of the rationalization [that] she wasn't working and she didn't want him to have to spend the money.

But then having that child in the bathtub, the risk of infection, no prenatal care -- again, how all those emotional issues, those cognitive issues came into play in terms of making her judgment flawed and that was the biggest issue.

And so because of that I recommended that she get into a course of individual therapy to help address those issues, to develop an understanding of: Hey, listen, when we have children, we've got to be able to think a little bit ahead. We have to think: Well, what happens if I do this? And if my child did that, what am I going to do? And begin to develop some anticipatory thinking.

N.T., 5/5/16, at 14.

Additionally, Dr. Russell noted that Mother obtained independent housing. However,

[t]here was no water heater. There was no furniture. There was a whole host of issues that I was concerned about, both in terms of the safety of the house and in terms of her, again risky thinking. You can't go and ask for your children back if you don't have any furniture and if you don't have any hot water. So her response was: Well, DHS will help me get that stuff.

. . . And so, basically, I said that she needed to make the repairs or get the repairs done, get some furniture in the house, and then if that was done at the same time I recommended liberal visitation with [C]hildren. It was not anything that was really difficult to do at the time. As I said, the biggest issue had to do with trying to correct the judgment that put [C]hildren at risk.

*Id.* at 14-15.[2]

A single case plan ("SCP"), which set the goal of reunification, was developed for Mother. Mother's recent SCP goals were: (1) to visit Children under Maternal Grandfather's supervision; (2) to comply with mental health therapy and the parenting capacity evaluation recommendations; (3) to obtain and maintain employment; (4) to attend parenting and anger management classes; and (5) to make necessary repairs to her home and comply with the home assessment.

On May 26, 2016, DHS filed petitions to terminate Mother's parental rights to Children and change Children's permanency goal to adoption. On June 7, 2016, the trial court held a hearing on the petitions. At the hearing, DHS presented testimony of Bethanna Community Umbrella Agency ("CUA") caseworker, Gina Morrison, and entered into evidence the May 5, 2016 testimony of Dr. Russell regarding Mother's parenting capacity evaluation. Mother, represented by counsel, failed to appear at the hearing.

With respect to Children's relationship with Mother, DHS presented the following the following evidence:

> [DHS's counsel]: And how would you assess the strength of the bond with [M]other in comparison with that of [M]aternal [G]randfather with [C]hildren?

_____

[2] We note, however, that Mother had been living with Maternal Grandfather before the February 4, 2014 safety plan and agreed to leave the Maternal Grandfather's home.

Ms. Morrison: So, [Mother] does come over, she helps prepare meals, she helps with dinnertime. She sometimes goes with [Maternal Grandfather] to pick up the kids from daycare, drop them off.

They definitely have a strong relationship with her. They do refer to her as mom, but she's not the one who's up in the middle of the night when the kids are sick, throwing up or—you know, it's [Maternal Grandfather] who's taking care of them every day and making sure that, you know, if [Mother] has to work late or on weekends, he's taking care of them.

He's the day to day caregiver of [Children].

N.T., 6/7/16, at 11. When asked whether she believed termination "would harm any of [Children] beyond repair if [M]other's legal rights were terminated and they were freed for adoption," Ms. Morrison responded, "I do not." *Id.* at 10.

Additionally, the Child Advocate examined Ms. Morrison as follows:

[Child Advocate]: . . . And with regard to your testimony with regard to the best interest portion of this case, is that—that would apply to each child individually, that you believe it wouldn't cause irreparable harm?

Ms. Morrison: Yes.

[Child Advocate]: And is also applied to each child, that you believe the parent-child relationship is with [Maternal Grandfather], and not [M]other?

Ms. Morrison: Yes.

[Child Advocate]: And with regard to the belief that you believe adoption in in the best interest: Is that with regard to each child, individually?

Ms. Morrison: Yes.

- 6 -

*Id.* at 16-17.

Lastly, during cross-examination by Mother's counsel, Ms. Morrison testified as follows:

> [Mother's counsel]: . . . Regarding the bond with mom, [Children] are bonded with [M]other, correct?
>
> Ms. Morrison: They have a relationship with her. They're connected. There is—there is a bond. I mean, they—they outreach to [Mother], you know, they're happy to see her. But their primary bond and caretaker is with their grandfather. I mean, he's the one who's there with them every day, all day long, you know, taking care and making sure that the daycare's set up, he's communicating with the daycare on a regular basis, making all their doctor's appointments, making sure they go.

*Id.* at 17-18.

At the conclusion of the hearing, the trial court entered decrees and orders terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and changing Children's permanency goal to adoption. On July 1, 2016, Mother filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Mother presents three questions for review:

> 1. Did the trial court err in terminating Mother's parental rights under 23 Pa.C.S. Section 2511(a)(1), Section 2511(a)(2), Section 2511(a)(5), and Section 2511(a)(8)?
>
> 2. Did the trial court err in finding that termination of [Mother's] parental rights best served [Children's] developmental, physical and emotional needs under 23 Pa.C.S. Section 2511(b)?

3. Did the trial court err in changing [Children's] goal to adoption?

Mother's Brief at vi.

Mother first claims that the trial court erred in finding grounds for termination under Section 2511(a). Mother argues that she is actively involved in Children's daily lives, provides them with essential care and subsistence, and performs parental duties such as taking them to day care, cooking dinner for them, helping them with homework, reading stories, and putting them to bed. Mother's Brief at 8-9. Mother further argues that DHS did not establish that the conditions causing the original placement with DHS were not remedied. *Id.* at 9. Mother emphasizes that she has achieved five out of seven of her SCP objectives including regularly visiting with Children, participating in a parenting capacity evaluation, completing parenting classes, completing anger management classes, and changing her work schedule to day shifts. *Id.* at 9-10. According to Mother, she "was not able to schedule" an assessment of the home she obtained after leaving Maternal Grandfather's home, and she reported attending CATCH for mental health treatment, although she concedes there was no documentation for that treatment. *Id.* at 2, 4. We conclude that no relief is due.

We review an appeal from the termination of parental rights using the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in

dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

. . . [E]ven where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation and quotation marks omitted).

"Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation omitted).

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (internal citations omitted).

Section 2511(a)(8) provides:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> \* \* \*

> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(8). Under Section 2511(a)(8), the petitioner must demonstrate the following factors: "(1) the child has been removed from

parental care for [twelve] months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the [child's] needs and welfare . . . ." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa. Super. 2003).

Section 2511(a)(8)

> Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the "developmental, physical and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court "engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re D.A.T.*, 91 A.3d 197, 205 (Pa. Super. 2014) (citation omitted).

Following our review, we discern no error or abused its discretion in the trial court's determination that Mother's conduct met the grounds for termination set forth in Section 2511(a)(8). Children were removed from Mother's care in February 2014, and DHS filed the petitions to terminate Mother's parental rights in May 2016, thus satisfying the twelve-month

requirement of Section 2511(a)(8). Moreover, mental health treatment was a primary objective for reunification, as was made clear to Mother in the recommendation made in the parenting capacity evaluation and multiple discussions with Ms. Morrison. Although Mother testified that she attended mental health therapy, there were no records of her attendance. Thus, although Mother completed many of her SCP goals, she did not address the primary objective of treating her mental health issues.

Additionally, the CUA caseworker testified that visitation did not evolve from supervised to unsupervised due to lack of mental health treatment and housing issues.[3] The caseworker further testified to her concerns for Children's overall safety if Children were reunified with Mother for the same reasons.

Thus, despite Mother's progress, her inability to remedy the conditions that led to the removal continued to exist twenty-eight months after Children's removal from her care. Moreover, there was evidence that in light of Mother's conduct, termination would best serve the needs and welfare of Children. Therefore, we discern no abuse of discretion or error of law in the trial court's consideration of Section 2511(a)(8).

Mother next challenges the trial court's determination that termination of her parental rights was proper under Section 2511(b). Mother argues

_____

[3] The trial court could consider Mother's lack of cooperation with DHS in scheduling a home assessment of her new residence. *Cf. In re D.A.T.*, 91 A.3d at 205.

- 12 -

there is a strong bond between her and Children and that termination of her parental rights are not in the best interests of Children. Mother's Brief at 11. She contends Children would be cut off from the only source of love, comfort, security and stability Children have ever known. We conclude that the trial court must give further consideration of Children's best interests before terminating Mother's parental rights under Section 2511(b).

Section 2511(b) states:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b). Under Section 2511(b),

> a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." . . . [T]he determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. **The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.**

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted) (emphasis added).

Instantly, the trial court entered the following findings of fact and conclusions of law at the termination and goal change hearing:

> What I found most compelling is that, while mom has done a number of objectives, the primary objective is mental health. And, because of that, she can never be with [Children] unsupervised. It really is a big barrier towards reunification because [Children] simply could not safely return home to [Mother].
>
> And so I'm happy that [Children] are with family and [Mother] will continue to have a relationship with [Children], but I do not believe that, during this time—this two-year period—that [Mother] has shown the [c]ourt that she would be able to be reunified with [Children].
>
> I believe that the testimony is clear that a significant bond, the parental bond, which is intact between [Children] and [Maternal Grandfather], and while [Mother] assists a lot, I do believe that [Children] look to [Maternal Grandfather] to meet their day to day needs.

N.T., 6/7/16, at 22. In its Pa.R.A.P. 1925(a) opinion, the trial court further explained:

> In the present matter, during the twenty eight months (28) [Children] have been in DHS care, [Children] have a parent-child bond relationship with their Grandfather, their foster parent. [Ms. Morrison] stated [Children's] financial, medical and daily needs were being met by the foster parent, [Maternal] Grandfather. Furthermore, [Ms. Morrison]'s testimony stated [C]hildren would not suffer any detrimental impact, nor irreparable harm, if [M]other's parental rights were terminated.
>
> [Ms. Morrison] testified to concerns of the overall safety of [C]hildren and [M]other if [C]hildren were to be reunified with [M]other. [Ms. Morrison] stated concern about reunification or permanency as unsupervised visitation was not expanded in this particular matter. The [c]ourt found convincing the testimony that [Children] indicated they would be fine in their current placement with the foster

- 14 -

> parent. Hence, the [c]ourt concluded [Children] would not suffer irreparable harm.

Trial Ct. Op. at 6 (record citations omitted).

We are constrained to conclude that the above analysis relied on insufficient evidence regarding the permanent severance of the bonds between Mother and Children. The existence of parental bonds between Mother and Children was undisputed. Without diminishing the facts that Mother gave birth to S.D.C. in a bathtub and turned S.D.C. over to a friend, the record establishes that Mother has been a resource for Children while Children were in Grandfather's care, and that the relationship between Mother and Children was generally positive.

We acknowledge that the trial court was entitled to credit and weigh the testimony of an agency caseworker regarding the bonds between Mother and Children. In the present case, however, Ms. Morrison's terse answers to the questions of whether Children would suffer irreparable harm provided little insight into the emotional and psychological effects of termination on Children. Furthermore, it appears that the trial court considered the fact that Children's placement with Maternal Grandfather would permit continued contact between Mother and Children. In light of the foregoing, we cannot conclude the trial court properly discerned the effects of permanently severing Mother's parental bond. *See In re T.S.M*, 71 A.3d at 267.

Accordingly, we vacate the order granting DHS's petition to terminate Mother's parental rights. The trial court shall consider the effects of

permanently severing Mother's parental bonds. Under the circumstances presented here, and given the apparent absence of additional bonding evidence, we conclude that the trial court shall order a professional bonding assessment and thereafter hold a hearing to consider that evidence as soon as possible.

Lastly, Mother contends that the trial court erred in granting DHS's requests for goal changes from reunification to adoption. Mother raises the same arguments set forth in her challenges to the trial court's order terminating her parental rights. In light of our decision to remand this matter for further proceedings under Section 2511(b), we vacate the order changing the goal from reunification to adoption pending the trial court's decision.

Decrees terminating parental rights affirmed in part and vacated in part. Orders changing permanency goal to adoption vacated. Case remanded for further proceeding consistent with this memorandum. Jurisdiction relinquished.

President Judge Gantman joins.

Judge Stabile concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/30/2017