J-S74001-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.J.B.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1760 EDA 2017 |

Appeal from the Order Entered May 9, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000466-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: K.S., A/K/A K.J.B.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1762 EDA 2017 |

Appeal from the Order Entered May 9, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-DP-0002320-2014

| | | |
|---|---|---|
| IN THE INTEREST OF: J.E.R.E., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.B., MOTHER | : | |
| | : | |
| | : | |
| | : | No. 1764 EDA 2017 |

Appeal from the Order Entered May 9, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000467-2017

J-S74001-17

IN THE INTEREST OF: J.E. A/K/A   :   IN THE SUPERIOR COURT OF
J.E.R.E., A MINOR  APPEAL OF M.B.,   :   PENNSYLVANIA
MOTHER   :
  :
  :
  :
  :
  :
  :
  :
  :   No. 1766 EDA 2017

Appeal from the Order Entered May 9, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0002323-2014


IN THE INTEREST OF: D.E., A MINOR   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
APPEAL OF: M.B., MOTHER   :
  :
  :
  :
  :
  :
  :   No. 1767 EDA 2017

Appeal from the Order Entered May 9, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000468-2017


IN THE INTEREST OF: D.E., A MINOR   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
APPEAL OF: M.B., MOTHER   :
  :
  :
  :
  :
  :
  :   No. 1774 EDA 2017

Appeal from the Order Entered May 9, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0002322-2014


BEFORE: BOWES, J., LAZARUS, J., and RANSOM, J.

- 2 -

MEMORANDUM BY BOWES, J.:                    **FILED JANUARY 16, 2018**

M.B. ("Mother") appeals from the decrees and orders entered on May 9, 2017, that involuntarily terminated her parental rights to her three daughters, K.J.B.S., J.E.R.E., and D.E., and changed the children's permanency goals from reunification to adoption.[1]  We affirm.

The children were born during September 2009, October 2011, and August 2012, respectively.  The Philadelphia Department of Human Services ("DHS") became involved with the family during June 2014, when it discovered that Mother was homeless and had deposited the three children with her mother, who was unable to provide care.  On October 10, 2014, when the children were ages five, three, and two, respectively, the juvenile court adjudicated the children dependent and awarded legal and physical custody to DHS.  The agency placed the children with M.B. ("Paternal Grandmother"), an adoptive resource.  The two older children, K.J.B.S. and J.E.R.E., participate in trauma therapy.  As of the date of the termination hearing, D.E. was being for tested for special needs.

The original permanency goal was reunification.  With the assistance of Turning Points for Children, the community umbrella agency that was engaged to administer reunification services, DHS fashioned a case plan that established several goals for Mother to attain.  She was required to maintain

_____

[1] The children's Father, J.E., died during October 2012.

- 3 -

a relationship with her daughters, cooperate with services and recommendations, execute medical and dental releases, communicate with Paternal Grandmother, participate in parenting classes, obtain suitable housing, and submit to a behavioral health assessment and comply with recommendations.

Mother complied with some aspects of the service plan and ignored others. For instance, Mother obtained housing before the December 2016 permanency review hearing; however, she failed to provide a copy of the lease to confirm that she had a long-term interest in the property. Likewise, in relation to employment, Mother claimed to work as both a school bus driver and as a nursing assistant. Again, however, she failed to provide DHS with documentation to prove her employment at either position or her income. Hence, the agency deemed Mother non-compliant with those aspects of the service plan.

As to the parenting component, Mother's endeavors were not availing. She completed a parenting class but was unable to incorporate the tools that she acquired. Indeed, agency caseworkers did not observe any improvement in Mother's parenting skills during the family's visitations. In addition, as a result of a parenting capacity evaluation performed by the court appointed expert during Spring 2016, the evaluator recommended that Mother enroll in individual parenting therapy. She failed to complete the program.

As it relates to visitation, Mother's efforts were similarly troubling. She was originally granted weekly supervised visitation at the home of Paternal Grandmother; however, visitation was subsequently amended to biweekly visitation at DHS or in the community after the juvenile court issued a restraining order against Mother for the protection of Paternal Grandmother. As discussed *infra*, visitation was restricted once more after Mother encouraged her daughters to fabricate a claim of abuse against Paternal Grandmother.

Mother's participation with visitations was sporadic, and when she did attend, she did not engage with K.J.B.S., J.E.R.E., and D.E. She was more focused on her electronic devices. Moreover, she was not attentive to her children's needs. In one incident, Mother brought D.E. a dairy drink despite knowing that the child had a dairy-based food allergy. Not surprisingly, D.E. had an allergic reaction, which required medical treatment. Rather than assuming responsibility for the blunder, Mother denied feeding D.E. the dairy-based drink. On another occasion, Mother coached the children to lie to the agency and to report that Paternal Grandmother was physically abusive. DHS investigated the report and determined that it was unfounded. Following that incident, the juvenile court amended the supervised visitations to require constant line-of-sight supervision. Finally, beyond the foregoing transgressions, Mother brought unauthorized adults to the visitations despite having notice of the agency's directive against it.

On April 25, 2017, DHS filed petitions to terminate the parental rights of K.J.B.S., J.E.R.E., and D.E. pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b). The trial court appointed counsel to represent Mother. The children's legal interests were represented by counsel, and a separate guardian *ad litem* was appointed to represent their best interests. During the ensuing hearing, DHS presented the testimony of the court-appointed parenting evaluator, two case managers from the community umbrella agency that administered reunification services, and the current DHS caseworker. Mother testified on her own behalf. At the close of the evidence, the trial court entered decrees terminating Mother's parental rights to the children under all four statutory grounds leveled in the petitions and issued three juvenile court orders changing the children's permanency goals.

These timely appeals followed.[2] Mother complied with Pa.R.A.P. 1925(a)(2)(i) by filing with her notices of appeal concise statements of errors complained of on appeal that raised four issues. She reiterates those complaints on appeal as follows:

> 1. Did the Trial Court error as a matter of law and abuse its discretion by terminating Mother's parental rights where the Department of Human Services (DHS) did not prove by clear and convincing evidence that Mother had not relieved the circumstances which brought the children into care and could not relieve them within a reasonable amount of time?

---

[2] We consolidated the appeals *sua sponte.*

2. Did the Trial Court error as a matter of law and abuse its discretion by terminating Mother's parental rights where there is no clear and convincing evidence that Mother has evidenced a settled purpose of relinquishing parental claim to the children or has refused or failed to perform her parental duties?

3. Did the Trial Court error as a matter of law and abuse its discretion by terminating Mother's parental rights as there was insufficient evidence presented to break the bond the children shared with Mother and where there was no clear and convincing evidence that the children would not be harmed by the termination of Mother's parental rights?

4. Did the Trial Court error as a matter of law and abuse its discretion when it changed the children's goals to adoption as substantial, sufficient, and credible evidence was presented at the time of trial which would have substantiated denying the Petition for Goal Change?

Mother's brief at 4. We review the goal change order for an abuse of discretion. *In re S.B.*, 943 A.2d 973, 977 (Pa.Super. 2008).

As it relates to Mother's challenge to the juvenile court orders changing the children's permanent placement goal from reunification to adoption, we observe that, during permanency review hearings, the juvenile court must consider several factors, including:

the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In re A.K.*, 936 A.2d 528, 533 (Pa.Super. 2007).

In relation to the termination of parental rights, our standard of review is well settled.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Involuntary termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. As the party petitioning for termination of parental rights, DHS "must prove the statutory criteria for that termination by at least clear and convincing evidence." *In re T.R.,* 465 A.2d 642, 644 (Pa. 1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203–04 (Pa. 1989).

As noted, the trial court terminated Mother's parental rights pursuant to § 2511(a)(1), (2), (5), (8) and (b), which provide as follows.

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . . .

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b).

After a thorough review of the parties' briefs and the pertinent law, we affirm the decrees terminating Mother's parental rights to K.J.B.S., J.E.R.E., and D.E., on the basis of the cogent and well-reasoned opinion entered on August 8, 2017, by the Honorable Allan L. Tereshko. In addition, we observe that, while Judge Tereshko's thorough opinion entreated this Court to affirm the respective orders changing the children's permanency goals and provided a strong foundation for that result, the opinion did not expressly address Mother's specific complaint that DHS's petition was not supported by sufficient credible evidence. Nevertheless, upon review of the certified record, we find that the record sustains the court's factual findings and legal conclusions regarding the children's current placement, Mother's lack of compliance, and her negligible progress toward alleviating the circumstances of placement. Most importantly, the record demonstrates both that reunification was not feasible and that adoption was inevitable. Stated plainly, there was sufficient competent evidence in the record for the

juvenile court to change the permanency goals from reunification to adoption. Hence, we affirm the goal change orders.

Decrees affirmed. Orders affirmed

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/16/18

THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA, PHILADELPHIA COUNTY
IN THE COURT OF COMMON PLEAS

| | |
|---|---|
| IN THE INTEREST OF: | : FAMILY COURT DIVISION |
| | : JUVENILE BRANCH- DEPENDENCY |
| | : |
| **K.J.B.S., a Minor** | : CP-51-AP-0000466-2017/CP-51-DP-0002320-2014 |
| d/o/b: 09/08/2009 | : |
| | : |
| **J.E.R.E., a Minor** | : CP-51-AP-0000467-2017/CP-51-DP-0002323-2014 |
| d/o/b: 10/06/2011 | : |
| | : |
| **D.E., a Minor** | : CP-51-AP0000468-2017/CP-51-DP-0002322-2014 |
| d/o/b: 08/29/2012 | : |
| | : |
| | : **Superior Court Nos. 1760 EDA 2017;** |
| | : **1762 EDA 2017; 1764 EDA 2017;** |
| | : **1766 EDA 2017; 1767 EDA 2017** |
| **APPEAL OF:** | : **& 1774 EDA 2017-CONSOLIDATED**[1] |
| **M.S.B., Mother** | |

## OPINION

M.S.B. ("Mother"), Appeals from the Decree and Orders entered by this Court on

May 9, 2017, granting the Petitions to Involuntarily Terminate Mother's Parental Rights

to her three minor children, a female, K.J.B.S., (d/o/b September 08, 2009); a female,

J.E.R.E., (d/o/b October 6, 2011); a female, D.E., (d/o/b August 29, 2012) ("Children"),

and changing the Children's Permanency Goal to Adoption, filed by the Department of

Human Services ("DHS") on April 25, 2017, and served on all parties.

---

[1] 6/22/2017-Consolidated Sua Sponte. Comment: Review of these matters indicates that these appeals involve related parties and issues. Accordingly, the appeal at Nos. 1760, 1762, 1764, 1766, 1767, and 1774 EDA 2017 are hereby CONSOLIDATED. See Pa.R.A.P. 513.

After a Termination/Goal Change Hearing on May 9, 2017, this Court found that clear and convincing evidence was presented to terminate the parental rights of Mother. In response to the Order of May 9, 2017, terminating her parental rights, Mother, by and through her counsel, filed a Notice of Appeal with Statement of Matters Complained of on Appeal on June 5, 2017.

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

In her Statement of Matters Complained of on Appeal, Mother raises the following issues:

1. The Trial Court erred as a matter of law and abused its discretion by terminating Mother's parental rights where the Department of Human Services did not prove by clear and convincing evidence that Mother had not relieved the circumstances which brought the Children into care or could not relieve them within a reasonable amount of time.

2. The Trial Court erred as a matter of law and abused its discretion by terminating Mother's parental rights where there is no clear and convincing evidence that Mother has evidenced a settled purpose of relinquishing parental claim to the Children or has refused or failed to perform parental duties.

3. The Trial Court erred as a matter of law and abused its discretion by terminating Mother's parental rights as there was insufficient evidence presented to break the bond the Children shared with Mother where there was not clear and convincing evidence that the Children would not be harmed by termination.

4. The Trial Court erred as a matter of law and abused its discretion by terminating Mother's parental rights and changed the Children's goals to adoption as substantial,

2

sufficient, and credible evidence was presented at the time of trial which would have substantiated denying the Petition for Goal Change.

## PROCEDURAL HISTORY

On June 15, 2014, the Department of Human Services (DHS), received a General Protective Services (GPS) Report alleging that the Children's Mother had been leaving them in the care of inappropriate caregivers; that Mother had left the Children in the care of their Maternal Grandmother, T.S., while Mother worked two jobs; that Mother also left the Children in the care of a cousin who appeared to be mentally delayed; that Mother frequently changed daycare providers; and that Mother appeared to have become unstable since the death of the Children's Father, J.E., in 2012. The Report also alleged that Maternal Grandmother, T.S., was overwhelmed with caring for Mother's Children; that T.S. had been hospitalized for mental health treatment as a result of experiencing suicidal ideations twice within the previous five years; that T.S. was prescribed medication to treat her mental illness; that on June 15, 2014, T.S. had awakened to the cries of the Children, who were left by Mother in T.S.'s home; and that T.S. was unable to plan for the Children. This Report was substantiated. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 04/24/2017, ¶"a").

On July 1, 2014, Community Umbrella Agency (CUA) Turning Points for Children (TPCFC) began providing in-home services for the family. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 04/24/2017, ¶"b").

On September 30, 2014, DHS received a GPS Report alleging that Mother was transient and left the Children in the care of their Paternal Grandmother, M.E.; that

3

Maternal Grandmother, T.S., was unable to care for the Children due to the state of her health and financial issues; that the Children's Maternal Aunt, who resides in Maryland, had been caring for the Children until two weeks earlier, but she was also experiencing financial issues; and that the Children have been residing with different family members since June 2014. The Report further alleged that Mother had not communicated with CUA Social Worker for two weeks; that Mother and the Children's whereabouts were unknown until September 30, 2014, when Mother arrived at M.E.'s home with the Children and requested that she care for the Children; that Mother was homeless; that Mother did not provide clothing, food, proof of medical insurance, or any other essentials for the Children; that Mother's whereabouts became unknown; and that Mother's mobile telephone was not in service. The Report further alleged that the Children received routine medical care at St. Christopher's Hospital for Children, and that D.E. was suffering from severe eczema, which Mother failed to treat appropriately. This Report was substantiated. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 04/24/2017, ¶"c").

On September 20, 2014, DHS visited the Children at the home of Paternal Grandmother, M.E. She stated that she was willing to care for the Children and requested financial assistance. She confirmed that the Father, J.E., was deceased. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 04/24/2017, ¶"d").

On September 30, 2014, DHS obtained an Order of Protective Custody (OPC) for the Children, who were in the care of Paternal Grandmother, M.E. (Exhibit "A"

4

Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 04/24/2017, ¶"e").

A Shelter Care Hearing was held on October 2, 2014 before Juvenile Court Hearing Officer, Alexis Ciccone. It was ordered that the OPC be lifted and transferred legal custody of the Children to DHS. The Children reside with Grandmother, and DHS to refer for Kinship services in Grandmother's home. Supervised visits with Mother shall occur, CUA to supervise at Grandmother's home. (Shelter Care Orders, 10/02/2014).

On October 2, 2014, CUA held a Single Case Plan (SCP) meeting. The parental objectives established for Mother were to cooperate with CUA services/DHS investigation; to make herself available to meet with CUA and to follow CUA recommendations; to sign medical and dental releases; to obtain a pre-paid cellular telephone and provide CUA and DHS with the telephone number; to communicate with Paternal Grandmother, M.E., before leaving the home that she needs baby sitting and to communicate with M.E. with what time she expects to return to the home; to visit a local food bank regularly prior to their being little food in the home; to participate in classes through the Achieving Reunification Center (ARC); to receive behavioral health assessment and comply with recommendations; to maintain a relationship with the Children through visits; to comply with services and remain in communication with CUA; to obtain suitable housing for the Children, and to complete a budgeting assessment. Mother failed to participate in the SCP meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 04/24/2017, ¶"g").

5

Adjudicatory Hearings for the three Children were held on October 10, 2014, before Honorable Allan L. Tereshko. The Court found that legal custody of the Children to transfer to DHS and placement in Foster Care (Kinship) with Paternal Grandmother, M.E. Mother to have supervised visitation weekly at Paternal Grandmother's home and supervised by her. CUA to refer Mother to ARC for parenting and housing. K.J.B.S. referred to BHS for consultation/evaluation. (Orders of Adjudication and Disposition – Child Dependent, 10/10/2014).

A continuance was granted on January 16, 2015, by the Honorable Margaret T. Murphy due to a building emergency closing. (Continuance Orders, 1/16/2015).

Permanency Review Hearings were held for the Children on February 13, 2015, before the Juvenile Court Hearing Officer Carol A. Carson. It was ordered that legal custody to remain with DHS, and placement to continue in Foster Care through Kinship with Paternal Grandmother. Mother to have supervised visits with Children at the Agency. Mother to provide documentation of her work schedule. Family members are to have supervised visits at the Agency—no visits at Paternal Grandmother's home. Mother is referred to BHs for consultation/evaluation. DHS to refer Mother for anger management. Mother is to attend ARC and to sign consents for Children to received mental health treatment. K.J.B.S. and D.E. are referred to BHS for consultation/ evaluation. A Stay-away Order was issued against Mother on behalf of Paternal Grandmother, M.E. Mother to stay away from M.E.'s residence at 2030 Longshore Ave., Philadelphia, PA. DHS to refer Mother to Behavioral Health and Wellness for a parenting capacity evaluation. (Permanency Review Order, 2/13/2015).

On April 10, 2015, CUA held an SCP meeting. The parental objectives for Mother were to make herself available to meet with CUA and to follow CUA recommendations; to sign medical and dental releases and follow up with immunizations and check-ups for the Children; to participate in classes through ARC; to receive behavioral health assessment and comply with recommendations; to maintain a relationship with the Children through visits; to provide CUA with the telephone number and updated contact information at all times; to obtain suitable housing for the Children, and to complete a budgeting assessment; and to contact CUA to confirm visits and to attend supervised visits at the Agency. Mother participated in the SCP meeting via telephone. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 04/24/2017, ¶"j").

Permanency Review Hearings were held for the Children on May 15, 2015 before the Juvenile Court Hearing Officer Carol A. Carson. It was ordered legal custody to remain with DHS, and placement to continue in Foster Care through Kinship with Turning Points for Children. Mother to have supervised visits with Children at the Agency twice a week for 1½ to 2 hours. Visits may be modified by agreement of the parties. Mother has been referred for a Parenting Capacity Evaluation (PCE). Mother is employed at Wis International, and is to provide her work schedule. Mother to continue classes at JJC and ARC, and continue mental health treatment. Stay away Orders stand against Mother as to Paternal Grandmother. K.J.M.B. and J.E.R.E. to begin therapy at CCTC on 5/18/2015. (Permanency Review Orders, 5/15/2015).

A continuance was granted on August 12, 2015, by the Honorable Allan L. Tereshko (Continuance Orders, 8/12/2015).

7

A continuance was granted on September 18, 2015, by the Honorable Allan L. Tereshko. Case remains Status Quo. (Continuance Orders, 9/18/2015).

Permanency Review Hearings were held for the Children on October 15, 2015, before the Honorable Allan L. Tereshko. The Court ordered legal custody to remain with DHS, and placement to continue in Foster Care through Kinship with Turning Points for Children. Mother to have supervised visits with Children in the Community and may be modified prior to next court date. Children doing well, and receiving services through CCTC. Mother receives parenting through JJC, and has been referred for a Parenting C Capacity Evaluation on 10/21/2015. Mother to provide confirmation of employment. Mother to continue classes at JJC and ARC, and continue mental health treatment. CUA Turning Points for Children to apply for Father's Death Certificate. (Permanency Review Orders, 10/15/2015).

A continuance was granted on January 14, 2016 at the request of Child Advocate for the case to be heard before a Judge. (Continuance Orders, 1/14/2016).

On February 9, 2016, CUA held an SCP meeting. The parental objectives for Mother were to make herself available to meet with CUA and to follow CUA recommendations; to sign medical and dental releases and follow up with immunizations and check-ups for the Children; to participate in classes through ARC; to receive behavioral health assessment and comply with recommendations; to have twice weekly supervised visits in the agency/community; to provide CUA with the telephone number and updated contact information at all times; to obtain suitable housing for the Children, and to complete a budgeting assessment; and to contact CUA to confirm visits and to attend supervised visits at the agency. Mother did not participate in the SCP meeting.

8

(Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 04/24/2017, ¶"m").

On April 11, 2016, a PCE was conducted by Dr. Erica G. Williams, Psy.D., and Samantha Peterson, M.A., of Forensic Mental Health Services, LLC, as to Mother. The Evaluation states that at this time, Mother does not present with the capacity to provide safety and/or permanency to the Children. Further, it states that there are currently multiple barriers to Mother demonstrating the capacity to provide safety and permanency to the Children; that she lacks appropriate housing at this time; that she only recently became employed and is unsure of her income going forward; that her history with the Children demonstrated a pattern of instability and transience; that she did not identify the effects of neglect on her Children not as a reason they are in treatment; that the Children's treatment providers are recommending suspended visits; that, per the Children's treatment providers, Mother has not followed through with caregiver sessions consistently at CCTC; that during the two caregiver sessions that she did attend at CCTC, she denied and minimized her role in her Children's history of trauma, including their neglect while in her care; and that during a recent supervised visit, Mother apparently coached the Children to make what have been concluded to be false allegations of child abuse against Paternal Grandmother, M.E. The Evaluation further states that Mother demonstrates a pervasive lack of insight into her role as a Mother and the impact it has on the Children, that she does not identify any behaviors as to leading to the Children's removal, and does not identify any changes she can and/or needs to make to be reunified with the Children. The PCE recommendations are that Mother enroll in individual therapy to help develop an understanding of the reasons her Children were originally

9

involved with DHS and then ultimately placed outside of her care; that she obtain and maintain appropriate housing; that she demonstrate the ability to maintain this housing for at least six months and have a financial plan that is sustainable to maintain beyond those six months prior to consideration of reunification; that she develop an obtainable and sustainable financial plan to provide for herself and her Children; and that, if visitation is not suspended, that it is imperative the supervision of visits occur at all times to include when she assists the Children in the restroom and that she maintains a strict observance of the Children's medical needs. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 04/24/2017, ¶"n").

Permanency Review Hearings were held for the Children on April 12, 2016 before the Honorable Allan L. Tereshko. The Court ordered legal custody to remain with DHS, and placement to continue in Foster Care through Kinship. Mother's attorney request for a continuance was granted. (Permanency Review Orders, 4/12/2016).

Permanency Review Hearings were held for the Children on May 4, 2016 before the Honorable Allan L. Tereshko. The Court ordered legal custody to remain with DHS, and placement to continue in Foster Care through Kinship with Turning Points for Children with Paternal Grandmother. Mother to continue her twice a week supervised line of sight and hearing visits with the Children at the Agency. Children receive weekly therapeutic services through CCTC and Medication Management. K.J.B.S. attends Solomon School in kindergarten. J.E.R.E. attends a therapeutic nursery. D.E. does not receive any special services at this time and is doing well. CUA to complete a home assessment on Mother's new home. Mother is referred to BHS for consultations and/or evaluations. (Permanency Review Orders, 5/04/2016)

10

Permanency Review Hearings were held for the Children on September 22, 2016 before the Honorable Allan L. Tereshko. The Court ordered legal custody to remain with DHS, and placement to continue in Foster Care through Kinship through Children's Choice. Mother to continue her twice a week supervised line of sight and hearing visits with the Children at the Agency. Prior order stands. (Permanency Review Orders, 9/22/2016).

On October 6, 2016, CUA held an SCP meeting. The parental objectives for Mother were to make herself available to meet with CUA and to follow CUA recommendations; to sign releases to allow CUA to obtain medical records and follow up with immunizations and check-ups for the Children; to have twice weekly supervised visits in the agency/community; to provide CUA with the telephone number and updated contact information at all times; to obtain suitable housing for the Children, and to complete a budgeting assessment; and to contact CUA to confirm visits and to attend supervised visits at the Agency. Mother did not participate in the SCP meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 04/24/2017, ¶"p").

A continuance was granted on December 20, 2016, at the request by parties for the case to be heard before a Judge and a contested time slot. (Continuance Orders, 12/20/2016).

**TERMINATION HEARING**

This Court held a Contested Termination and Goal Change Hearing on May 9, 2017, regarding Mother's parental rights. Mother, M.S.B., attended the hearing and was represented by counsel. (N.T. 5/09/2017, p.3 at 23-24).

11

Counsel for DHS, Megan Fitzpatrick, noted at the beginning of the hearing that birth certificates for two of the Children were provided, however, the request for the birth certificate of D.E., was returned by Vital Records of Pennsylvania saying no record existed. Mother had stated that D.E. may have been born in Maryland, however, a request to Maryland Vital Records indicated there was no record found nor birth certificate found. Ms. Fitzpatrick sought to proceed without having been able to obtain the Child's original birth certificate. This Court granted her request. (N.T., 5/09/2017, p.7 at 17-25; p.8 at 1-18).

Ms. Fitzpatrick further stated that Father, J. E. was deceased and her Agency received the original death certificate from Paternal Grandmother, M.E., today. Date of death was October 3, 2012. (N.T., 5/09/2017, p.8 at 21-25; p.9 at 1-14).

Ms. Fitzpatrick then called the first witness to testify, Dr. Erica Williams, Psychologist from Forensic Mental Health Services. Dr. Williams conducted the Parenting Capacity Evaluation on Mother on April 11, 2016. Mother was referred for an Evaluation after her Children were removed from her care due to concerns that she was neglecting them. Leaving them with other adults, not checking in and not being able to be reached and not leaving the Children with provisions when she did leave. There were additional concerns that she was not willing and/or able to do the necessary things to achieve reunification and when she was given the opportunity to have contact with the Children she appeared to be disengaged and often times did not interact with them. (N.T., 5/09/2017, p.10 at 13-25; p.11 at 1-10).

Dr. Williams noted the Evaluation occurred one year ago, and noted that there is no timeline used, rather a reevaluation is necessary based on events and behaviors. She

12

stated a re-referral for Evaluation was not made. At the Evaluation, Mother told her that the Children came into care because Maternal Grandmother called DHS and stated that Mother abandoned the Children with her, and did leave the proper supplies and could not be reached. (N.T., 5/09/2017, p.13 at 1-25; p.14 at 1-6).

Dr. Williams testified Mother completed the MMPI2 paperwork. The results dictated a pervasive pattern of either denying, minimizing or being detached from what was occurring regarding her Children. There was a deliberate attempt to portray herself in a positive light, to deny daily fault and foibles and that significantly raised the L (lie) scale, and it keeps the evaluator from interpreting the clinical scales. Mother was not able to identify herself as having a role, and wasn't able to see herself as impacting the Children nor their case. Her coping skill was to not address the issues, and not face the concerns. (N.T., 5/09/2017, p.14 at 18-25; p.15 at 1-25).

Dr. Williams discussed the Children's therapy, and Mother stated they were in therapy at the urging of Paternal Grandmother because they need to deal with the death of their Father. Mother did not indicate she was involved with the therapeutic services of her Children. When treating Children with trauma therapy, CCTC follows a trauma model which includes caregiver sessions as well as bringing in the caregiver to sessions to be able to recognize and address the trauma the Children are facing. At the time of the Evaluation, Mother was not participating in their treatment. (N.T., 5/09/2017, p.17 at 1-13; p.18 at 1-15).

Regarding visitation, Dr. Williams testified Mother had supervised visitation twice a week with her Children. Mother noted she did not have any concerns with the visitation at that time. However, Dr. Williams had received additional information that

13

Mother often did not show up for visits, and when she did appear, she would either not engage with the Children or show up with additional adults despite being told that other adults could not attend. She would be more focused on her electronics and not engaging with the Children. There was a specific incident with the youngest Child, D.E., where the records showed that Mother brought a dairy shake to give the Child, knowing the Child had a dairy allergy. The Child had an allergic reaction and required medical treatment. Mother denied bringing the drink or feeding the Child dairy. (N.T., 5/09/2017, p.18 at 16-25; p.19 at 1-25; p.20 at 1-3; p.21 at 7-15).

Dr. Williams further testified she noted information from other records that during a supervised visit, Mother had coached the Children to report that Paternal Grandmother, the caretaker, was physically abusing them. It gave her concern that a parent would encourage a Child to make false reports of abuse, because as an adult it is your job to help teach the Children fact and fiction and to teach them to tell the truth. Telling the Child to lie about their caretaker places the Child at risk because it undermines the attachment, and undermining the stability, causing a rife in a relationship that is at the moment very critical to the Child. It is done to intentionally sabotage that relationship and sabotages the Child's ability to have a healthy attachment. (N.T., 5/09/2017, p.21 at 20-25; p.23 at 6-25; p.24 at 1-5).

Dr. Williams opined there were multiple barriers for reunification with Mother. First and foremost was the issue of transiency and no housing. Mother was unable to identify her transient behavior or her multiple choice of caregivers for her Children. She did not identify as part of the reason that they were in therapy. She did not identify herself as having a role in their removal. She was not able to identify her role as Mother

14

or how she effects the Children. At the time, Dr. Williams recommended individual therapy for Mother for her to develop a realistic understanding of the lifeline of the Children. To be able to put down in chronological order the various homes that she lived in, and placed the Children in. To begin to see her role in how they were moved around and how a transient lifestyle impacted them. Then to help her build insight into her role as a Mother to provide stability. Dr. Williams also recommended that Mother obtain and maintain housing for at least six months in the same dwelling. (N.T., 5/09/2017, p.24 at 15-25; p.25 at 1-25; p.26 at 1-19).

Regarding employment, Dr. Williams testified it was important to include employment and financial planning in the evaluation because it minimizes transiency and lets parents provide stability and to meet the Children's needs both financially and emotionally. It is important that the parent provide documentation of what the finances are and to provide paystubs from employment. (N.T., 5/09/2017, p.26 at 25; p.27 at 1-19).

Dr. Williams testified that regarding visitation, there were concerns that Mother was coaching the Children, so there was a need to be supervised with eyes and ears on the Children at all times so that the content was known and if any attempts were made to coach the Children again it would be stopped and the Children would not be exposed to that again. The fact that visitation four years into placement continues to be supervised is a concern because there are clear issues that have prevented Mother from moving forward to unsupervised visits. (N.T., 5/09/2017, p.29 at 4-18; p.30 at 1-14).

Dr. Williams opined that at the time of the Evaluation, Mother did not present with the capacity to provide safety nor permanency to any of her three Children. She

15

further noted that if the recommendations she made a year ago still remain outstanding and there have been no significant changes in the case, she would not change her opinion today. (N.T., 5/09/2017, p.30 at 16-25; p.31 at 1-3).

On cross-examination by Craig Sokolow, Child Advocate, Dr. Williams noted that the allegations of child abuse against Paternal Grandmother were investigated and found not to be true. She further noted that according to information she received, Mother never participated in individual therapy. (N.T., 5/09/2017, p.31 at 12-25; & p.33 at 4-8).

The next witness to testify was Megan Flanagan, the CUA Supervisor. She testified the family began receiving in-home services in September 2014, then it turned into a placement case because Mother had left the Children unattended. Maternal Grandmother was being made responsible for the Children at that time, was ailing and could not care for them. A family member made a call to the Agency. The Children were then placed with Paternal Grandmother. (N.T., 5/09/2017, p.64 at 17-25; p.65 at 14-25; p.66 at 1-19).

Ms. Flanagan testified Mother's objectives in the single case plan were to obtain suitable housing, supervised agency visits, proof of employment, participation in parenting classes, and individual mental health therapy, and subsequently, to complete a parenting capacity evaluation.

She noted that Mother did not participate in the case plan meeting while she was the Case Manager, however, Mother was made aware of her objectives by outlining her goals every time she met with her. The objectives were also outlined at the supervised visits. (N.T., 5/09/2017, p.67 at 1-23).

16

Ms. Flanagan testified regarding housing, that Mother has stable housing at this time. Her current Case Manager has been able to see the home herself as recently as March 2017, and Mother has maintained this housing since December 2016. Mother resides there by herself. (N.T., 5/09/2017, p.69 at 6-25).

She further testified regarding employment, that Mother claims she works two jobs. However, she has never received proof of employment throughout the life of the case. Mother's work schedule is necessary to set the visitation and wanting to have longer quality visits, if possible. At this time, the visitation has only been one hour. Mother reported she had limited time because she worked late on Saturdays and unable to get to the Agency until six o'clock. However, Mother never presented any documentation regarding her paystubs nor a work schedule. (N.T., 5/09/2017, p.70 at 1-25; p.71 at 1-13).

Regarding Mother's mental health treatment, Ms. Flanagan testified Mother provided a one-time proof of treatment from July 2016. It was documentation from Northeast Community Center for Behavioral Health. However, that was the only instance that Mother provided documentation. (N.T., 5/09/2017, p.71 at 14-25; p.72 at 1-5).

Ms. Flanagan further testified that Mother was not participating in the CCTC treatment with her Children. The therapist reported that the Agency made many attempts to engage Mother but were unsuccessful. Regarding parenting classes, Mother did participate in classes through JJC in 2015. However, Ms. Flanagan testified she did not witness any improvements in Mother's parenting skill after she completed the classes. (N.T., 5/09/2017, p.72 at 15-25; p.73 at 1-13).

17

Regarding the incident when D.E. consumed dairy products and became ill, Ms. Flanagan testified Mother had signed a form in the summer of 2016, stating that she would not bring or feed the Children anything outside of water due to the severity of the allergies, specifically around D.E. She had various conversations with Mother regarding the severe allergies, and Mother claimed the Child did not have allergies, and that Paternal Grandmother was fabricating that condition. Prior to that incident, the Agency had supervised visits in the community for Mother, however that was reverted back to supervised visits in the Agency after this happened. (N.T., 5/09/2017, p.73 at 21-25; p.74 at 11-25; p.75 at 1-20).

Ms. Flanagan also testified about an incident in the spring of 2016, when K.J.B.S. told the Case Worker that her Mother had whispered in ear, telling her to tell the Worker that their Paternal Grandmother was beating them so they could then live with her. After that incident, Mother was not allowed to take the Children to the bathroom without supervision, always to be within sight and hearing of the staff. (N.T., 5/09/2017, p.77 at 10-25; p.78 at 1-7).

Ms. Flanagan testified that K.J.B.S. is enrolled in Tree of Life, getting medication management from CCTC for post-traumatic stress disorder, and was discharged in the spring of 2017. D.E. is being enrolled in a Pre-K program, and is being tested for special needs. She has insomnia issues and is in the process of being diagnosed. She also has severe allergies, as well. J.E.R.E. is receiving medication management through CCTC for a seizure disorder, and was recently discharged from trauma therapy. She noted that Mother has not been actively involved in her therapy and

18

has failed to sign the consents required for Tree of Life. (N.T., 5/09/2017, p.82 at 7-15; p.84 at 12-22; p.86 at 6-25).

Ms. Flanagan opined that Paternal Grandmother, M.E., has been stable, and the permanent caregiver for the Children since the Children came into care. The Children do not look to Mother to meet any of their basic needs, and Mother has not assumed any parental role for these Children. She has not observed any positive strengths nor increased bonding in Mother's relationship with her Children, and does not believe Mother is in a position for reunification with the Children within the next six months. She opined the Children would not suffer irreparable harm if Mother's parental rights were terminated, and it is in the Children's best interest to change their goal to Adoption. (N.T., 5/09/2017, p.83 at 3-25; p 84 at 1-11; p.85 at 6-25; p.86 at 1-5; p.87 at 2-14).

On cross-examination by Faryl Bernstein, GAL, Ms. Flanagan stated that Paternal Grandmother has made sure all of the Children's medical appointments have been kept, and particularly, J.E.R.E.'s care for her seizure disorder. She stated Mother has also denied that the Child has a seizure disorder, despite the medical diagnosis. She further stated Paternal Grandmother is the adoptive resource for the Children. The Children have been placed with Paternal Grandmother since they came into care, and have a strong, loving bond with her. (N.T., 5/09/2017, p.89 at 1-11; p.92 at 1-25).

Noella Torres, CUA Case Manager for Turning Points for Children, was next to testify. She stated she supervised the case for approximately six months, from 2016 to 2017. She stated she had several meetings with Mother to discuss her objectives. Mother was in compliance with visitation, however was not in compliance with contacting the CCTC therapist and being involved. She noted that when she met Mother, she had

19

recently moved to her apartment on Godfrey Street. Mother was not receiving mental health treatment as instructed, and did not provide her with details regarding her employment. (N.T., 5/09/2017, p.137 at 5-25; p.138 at 1-25; p.139 at 1-9).

Ms. Torres testified she saw the Children at Paternal Grandmother's home twice per month. She observed the Children with their Grandmother and saw that their relationship was very positive, and they had a loving bonded relationship. The Children's Paternal Aunt, and another cousin also live in the home, and the family unit is good overall. She further opined that it would be in the best interest of the Children to be adopted by their Paternal Grandmother. (N.T., 5/09/2017, p.139 at 10-25; p.140 at 1-13).

Javenne Avery, CUA Case Manager for Turning Points for Children, was the next witness to testify. She stated she has been assigned to this case for the last two months, and last saw the Children on April 18, 2017. She has seen the Children at the home about six times, and stated she witnessed the Children's hair being combed, homework being done, eating at the table, and overall, witnessed a loving, caring, normal, natural family home environment. She opined that it would be in the Children's best interest to be adopted by Paternal Grandmother. (N.T., 5/09/2017, p.146 at 6-25; p.147 at 1-23).

Mother was the next to testify. She stated she leased an apartment one year ago at 500 East Godfrey Street, Philadelphia, PA., and provided a copy of the lease to Ms. Flanagan. She did not have a copy of the lease to present at the hearing. (N.T., 5/09/2017, p.154 at 11-25; p.155 at 1-7).

Mother testified she is employed as a bus driver at First Student located at 55 Red Lion Road, Huntingdon Valley, PA 19006. She works 20-35 hours per week, and receives $19.87 per hour wage. She further stated she has a second job at Vital Support,

a home care agency, where she works as a home care aid for her mother. Her hourly rate is $11.25 per hour and works 20 hours per week. Mother states she gets her wages paid through direct deposit and does not have check stubs, and her income can only be obtained through her bank statement. She banks at Bank of America, however, she did not have bank statements, nor W-2 forms. (N.T., 5/09/2017, p.157 at 4-25; p.158 at 1-25; p.159 at 1-25; p.160 at 1-25; p.161 at 1-24).

Regarding mental health issues, Mother testified she has not been diagnosed with a mental health illness, however, she presented a letter from a therapist. She attended trauma therapy for the Children four months ago, and stated she will continue to attend on Tuesday and Fridays at 6:00 p.m. (N.T., 5/09/2017, p.162 at 20-25; p.163 at 1-20).

Mother denied asking her daughter to lie about being abused by her Grandmother, and stated that her Children want to live with her. She further stated she has obtained housing, she became employed, and understood what objectives she had to accomplish and has done that. (N.T., 5/09/2017, p.164 at 3-25).

Mother stated she has a pretty good bond with her daughters, and they would be irreparably harmed if her parental rights were terminated. She understands that her Children have food allergies and that she brings food for them when their Grandmother suggests. Finally, Mother stated she would present herself to the Tree of Life Agency to sign paperwork. (N.T., 5/09/2017, p.165 at 4-25; p.166 at 1-20).

## STANDARD OF REVIEW AND LEGAL ANALYSIS

When reviewing an appeal from a decree terminating parental rights, an appellate Court is limited to determining whether the decision of the trial court is supported by

21

competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, an appellate court must accord the hearing judge's decision the same deference that it would give to a jury verdict. The Pennsylvania Superior Court need only agree with a trial court's decision as to any one subsection under 23 P.C.S.A. §2511 (a) in order to affirm a termination of parental rights. *In re D.A.T.* *91 A.3d 197 Pa.Super.2014).*

The standard of review in termination of parental rights cases requires appellate Courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. In re T.S.M., 620 Pa. 602, 71 A.3d 251, 267 (2013) (citations and quotation marks omitted) In re Adoption of C.D.R., 2015 PA Super 54, 111 A.3d 1212, 1215 (2015).

Termination of parental rights is governed by Section 2511 of the Adoption Act 23 Pa.C.S.A. §§ 2101–2938, which requires a bifurcated analysis. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the

22

second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond. *In re L.M.,* 923 A.2d 505, 511 (Pa.Super.2007) (citations omitted). In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1049-50 (2015). The Court need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1050 (2015).

These three Children became known to DHS in June 2014, when the Agency received a Report that Mother was transient, leaving her Children with other adults, not responding to communication, and not providing for the needs of her Children. Mother left the Children with Maternal Grandmother, who was sickly and could not care for the Children. CUA began providing in-home services for the family in July 2014. In September 2014 DHS received another Report stating Mother had left the Children with different family members since June and that Paternal Grandmother, M.E., now had the Children in her home. Mother was homeless, and after she left the Children with Paternal Grandmother, her whereabouts were unknown. The Children's ages at this time were 5 years, 2 years 11 months, and 2 years. The Children were adjudicated Dependent on October 10, 2014, and placed with Paternal Grandmother, M.E., where they remain to this day.

**A. The Trial Court Properly Found the Department of Human Services Met Its Burden by Clear and Convincing Evidence To Terminate Mother's Parental Rights Pursuant to 23 Pa.C.S.A. §2511(a)(1), and (2), (5), and (8)[2]**

This Court found clear and convincing evidence to terminate Mother's parental rights pursuant to 23 Pa.C.S.A. §2511(a)(1), (2), (5) and (8).

On Appeal, Mother states the Court erred by terminating her parental rights where DHS had not proved by clear and convincing evidence that she had not relieved the circumstances which brought her Children to care, or could not relieve them within a reasonable amount of time. She further alleged that no clear and convincing evidence was presented that she relinquished her parental claim to the Children, or has refused or failed to perform parental duties.

---

[2] 1(a) General Rule.—the rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parenting claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(5) The child has been removed from the care of the parents by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of the parental rights would best serve the needs and welfare of the child.

This Court relied on lengthy and credible testimony by three CUA Case Managers, Ms. Flanagan, Ms. Avery, and Ms. Torres, who testified that Mother was aware of the parental objectives established for her for reunification with her Children, and that she failed to achieve these objectives. The Agency was able to verify Mother's housing in December 2016, however, Mother's assertion that she was employed at two jobs was never verified because Mother never brought in evidence of pay stubs, bank statements, employment letters, nor W-2 forms.

Regarding visitation with the Children, evidence was presented that Mother would attend the one hour supervised visit, but claimed she had limited time because she worked late on Saturdays and unable to get to the Agency until six o'clock. However, Mother never presented her work schedule to aid the managers in facilitating visitation. Testimony was presented that when Mother did attend visits, she appeared distracted by her electronics and was disengaged with the Children. At one visit, Mother mistakenly provided D.E. with a dairy drink, after being instructed that she should not bring food/drinks for her because of her severe allergies. Mother claimed the Child has no food allergies, despite being presented with medical evidence. Mother's supervised community visitation visits twice per week were changed to twice weekly supervised line-of-sight and hearing after an incident where the eldest Child, K.J.B.S. reported to Ms. Flanagan that Mother asked her to report physical abuse by Paternal Grandmother. The Agency followed up with the allegations and they were unfounded.

Evidence was presented that Mother failed to complete individual therapy, as court ordered, and has not followed through with caregiver sessions consistently at CCTC. She did attend two sessions, however, she denied and minimized her role in her

25

Children's history of trauma. Mother provided a one-time proof of treatment from July 2016. It was documentation from Northeast Community Center for Behavioral Health. However, that was the only instance that Mother provided documentation.

The Court also relied on Expert testimony given by Dr. Erica Williams, who conducted Mother's PCE. Dr. Williams stated Mother's tests results dictated a pervasive pattern of either denying, minimizing or being detached from what was occurring regarding her Children. There was a deliberate attempt to portray herself in a positive light, to deny daily fault and foibles and that significantly raised the L (lie) scale. She further noted that Mother was not able to identify herself as having a role, and wasn't able to see herself as impacting the Children nor their case. Her coping skill was to not address the issues, and not face the concerns.

Dr. Williams opined there were multiple barriers for reunification with Mother. First and foremost was the issue of transiency and no housing. Mother was unable to identify her transient behavior or her multiple choice of caregivers for her Children. She did not identify as part of the reason that they were in therapy. She did not identify herself as having a role in their removal. She was not able to identify her role as Mother or how she effects the Children. At the time, Dr. Williams recommended individual therapy for Mother for her to develop a realistic understanding of the lifeline of the Children. She further testified that at the time of the evaluation, Mother did not present with the capacity to provide safety nor permanency to any of her three Children. She further noted that if the recommendations she made a year ago still remain outstanding and there have been no significant changes in the case, she would not change her opinion today.

### B. Trial Court Properly Found that Termination of Mother's Parental Rights was in the Children's Best Interest and that DHS Met Its Burden Pursuant to 23 Pa.C.S.A. §2511(b).[3]

After the Court finds that the statutory grounds for termination have been satisfied, it must then determine whether the termination of parental rights serves the best interests of the children pursuant to 2511(b) In re Adoption of C.L.G., 956 A2d 999 (Pa.Super 2008). In terminating the rights of a parent, the Court 'shall give primary consideration to the development, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. §2511(b). One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child. In re T.S.M., 71 A3d.

Mother asserts the Trial Court erred because there was insufficient evidence presented to break the bond the Children shared with Mother, and that the Children would be harmed by termination of her parental rights. She further asserted that substantial evidence was presented to deny the Petition for Goal Change.

The Court disagrees. Mother failed to present evidence to corroborate her assertions and her testimony was found to be not credible by this Court. On the other hand, credible evidence was presented by the three CUA Case Managers, who testified

---

[3] Other Considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1),(6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

27

that the Children were bonded to paternal grandmother and look to her for safety and to meet their needs. They further testified that the Children needed the safety and security that Mother cannot provide, and it would be in their best interest to be adopted by Paternal Grandmother. The Court also found credible the evidence that the Children enjoyed being around Mother, however, did not seek her for their parental needs and were not bonded to her.

Therefore, this Court reasoned that the Children would not suffer irreparable harm if Mother's parental rights were terminated, and it would be in their best interests to be adopted.

## CONCLUSION:

At the conclusion of the hearing the Court stated:

> First thing I have to do is to rule on the issue of credibility since it looms as a very, very large issue in this case. Because of the varying discrepancies in the varying contradictions between the evidence presented by the Department and the evidence that comes in through Mother and because this is an opportunity for the Mother to bring in all the evidence that will bear on the issues before the Court, and the failure of the Mother to bring any documents to substantiate her claims. Even something as remote as a paystub or bank statement which she says she has available, the failure to bring it in looms large in this Court's mind. And it looms large because either the Mother is lying completely or lying partially, distorting the facts, distorting reality, and presenting a picture which based upon the objective evidence, which can and should have been presented to this Court, the Court can only form one conclusion that much of what Mother says is made up, fantasized or outright lying.
>
> Therefore, Mother's approach to the parenting has to be viewed in the light which suggests that nothing she says has

28

any credibility, nor weight, nor should it be given any weight.

These are not complex documents. These are things that are available by going on to a computer and picking up your account and printing out a documents. And yet Mother who is represented by counsel throughout all these hearings, yet with the availability of advice by counsel that these documents should be presented to the Court to substantiate the claims lays very heavily on this Court.

Therefore, I discount everything Mother has said about her relationship to the Children, about the events that occurred in the past. And what the Court has before it is basically uncontradicted evidence that throughout the period of time beginning somewhere in 2014, the Children were moved around from house to house and left with persons who were identified as being inappropriate. That has never been contradicted. And as a result of that, the Children wound up with paternal grandmother who they have been with since October of 2014.

And not withstanding Mother's claim that she has a relationship with the Children, what's most important is that there is no evidence that she has a parental relationship with the Children. The evidence is that she's friendly with the Children. They enjoy coming to spend time with her occasionally. They enjoy playing with computers. But at no time did I hear evidence that Mother exhibited any parental relationship with the Children nor exercised any parental care or control of the Children.

The idea that Mother has had an apartment and she does not have a lease and she expects the agency to bring in a copy of her lease, again, weighs heavily on the Court in deciding that there is no valid competent evidence by Mother that she is even remotely attempting to meet her objectives.

The Children have been placed with the paternal grandmother. And we're at thirty-one months as I understand the evidence. And at no time during that period did the Mother exhibit any desire to become a parent to these Children. She was content to let the Children remain in DHS' care, be cared for by the agency, and the caretaker parent be provided a sustenance to care for these Children.

During the course of the proceedings before the Court, Mother advanced to unsupervised visitation and then regressed. And the supervised visitation for two hours per

week has been in existence throughout the majority of this case, and remains today. The Mother has taken no steps to change that relationship, preferring someone else to raise her Children and someone else to support her Children.

Although, it has been testified that there is a relationship between Mother and Children, it is not a parental relationship nor is there any evidence that there is a parental bond between Mother and Children. And the evidence is uncontradicted that there would be no irreparable harm to the Children, that if necessary could not be remedied through the loving care of the perspective adoptive mother.

There's overwhelming testimony by all of the workers who have been involved with this case from the beginning that indeed it would be in the best interest of these Children to be adopted.

Therefore, considering 2511 (a) (1), (2), and I'll put in (5) because I believe that the testimony supports the finding that the Children were still in Mother's care notwithstanding the fact that she had been shifting the Children around from house to house but they were still primarily in her care when DHS intervened and took the Children out of her custody that (5) is satisfied, and section (8) because the placement has been in excess of one year.

So repeating under 2511 A (1), (2), (5), and (8) of the code is satisfied.

Now under 2511 (b), as I recited the testimony is overwhelming, clear and convincing without any contradiction that there would be no irreparable harm to the Children if Mother's rights were terminated and it would be indeed in the best interest of these Children for the goal to be changed to adoption. And the only way that can happen is if Mother's rights were terminated.

The Children are in a safe, caring, loving home where all of their needs are being met and as the evidence supports will continue to be met in the future.

The paternal grandmother has attended to all of the Children's medical needs and in the case of the older Child, she is now in school and grandmother has attended all of her social and educational needs and I suspect that given her track record she'll be attended to all of the emotional, social, and educational needs of the Children going forward. 2511(b) is satisfied.

30

Mother's rights are terminated and the goal for all three
Children is now moved to adoption.

(N.T., 5/09/2017, p.173 at 18-25; p.174 at 1-25; p.175 at 1-25; p.76 at 1-25;

p.177 at 1-25; p.178 at 1-25; p.179 at 1-3).


For the foregoing reasons, this Court respectfully requests that the Decree and

Order of May 9, 2017, Terminating Mother, M.S.B.'s Parental Rights and changing the

Children's Permanency Goals to Adoption be AFFIRMED.


**BY THE COURT:**

_____
**ALLAN L. TERESHKO, Sr. J.**

_August 8th, 2017_
**DATE**

31

## CERTIFCATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing OPINION has been served upon the following parties by the manner as designated:

**Family Court Delivery Mail Box**

Meagan Fitzpatrick,, Esq. ACS,
Phila Solicitor's Office
One Parkway, 1515 Arch St, 15th flr.
Philadelphia, PA  19102
DHS Counsel


Janice Sulman, Esq.
1500 Walnut  St, Ste., 2000
Phila., Pennsylvania  19102
Counsel for Appellant Mother, M.B.


Faryl Bernstein, Esq.
Defenders Assoc. of  Phila.
Child Advocacy Unit
1441 Sansom St.
Phila., Pennsylvania  19102
Guardian Ad Litem, for Children

Craig B. Sokolow, Esq.
236 S. 21st Street, Ste. B
Phila., Pennsylvania  19103
Child Advocate


_____
**ALLAN L. TERESHKO,  Sr. J.**

_____
**DATE**