J-S09031-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1351 WDA 2022 |

Appeal from the Order Entered October 19, 2022
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000148-2021

BEFORE:  BENDER, P.J.E., BOWES, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED:  May 5, 2023**

J.B ("Mother") appeals the order that involuntarily terminated her parental rights to L.B. ("Child"), her daughter born in April 2018.[1]  After careful review, we affirm.

We glean the relevant factual and procedural history of this matter from the certified record.  The Allegheny County Office of Children, Youth, and Families ("CYF") first became involved with this family five days after Child's birth when Mother admitted to substance abuse during her pregnancy.  *See* N.T., 9/12/22, at 99-100.  CYF did not seek to remove Child from the home at that time.  Mother and Child's putative father, C.S. ("Father"), were undergoing treatment for their substance abuse problems.  *See id*. at 100.

---

[1]  The Orphans' Court's October 19, 2022 order also involuntarily terminated the parental rights of C.S. ("Father") and any "unknown" father.  Father did not file a notice of appeal and he has not participated in this matter.

In August 2019, CYF received a referral regarding allegations of intimate partner violence ("IPV") by Father against Mother. *See id*. at 101-02. CYF accepted the family for service, referred Mother to an IPV specialist to assist her in seeking a protection from abuse ("PFA") order,[2] and interviewed members of Mother's and Father's extended families. *See id*. at 102-03.

In September 2019, Mother contacted CYF and reported that Father held her against her will in their shared home until she was able to flee to a nearby police station. *See id*. at 103-04. On the day of Mother's report, CYF obtained an emergency custody authorization placing Child in the physical care of maternal grandmother ("Grandmother"), where she remained almost three years later. *See id*. at 104-07. In October 2019, Child was adjudicated dependent and ordered that she remain in kinship care with Grandmother. *See id*. at 107-08. In the same order, the court directed Mother, *inter alia*, to address her ongoing mental health issues and to receive drug screenings. *See id*. at 108.

CYF set goals that Mother obtain independent employment and housing, continue both IPV counseling and substance abuse treatment, participate in visitations with Child, and address her mental health problems and provide signed medical information releases to CYF. *See id*. at 117, 121. Mother successfully obtained housing in January 2020, and claimed to have found

---

[2] Mother ultimately did so, albeit reluctantly. *See* N.T., 9/12/22, at 132.

employment as an in-home care provider. *See id*. at 118-19. Mother completed IPV counseling in September 2020 and continued treatment for substance abuse. *See id*. During this initial time period, the court granted Mother "liberal, unsupervised" visits with Child. *See id*. at 106, 118-19.

Despite multiple attempts, CYF was unable to confirm Mother's employment and she lost her housing when Pennsylvania's Emergency Rental Assistance Program ("ERAP") expired in 2022. *Id*. at 119-22, 185; *see also* N.T., 10/17/22, at 8. Mother experienced relapses in substance abuse in June 2020 and August 2021. *See* N.T., 9/12/22, at 124-27. In June 2020, Mother rescinded the releases she had previously signed permitting CYF to obtain records of her drug treatment; after signing new releases, she rescinded those releases in April 2022, preventing CYF from assessing her compliance with drug and alcohol counseling. *See id*. at 42-43, 86, 123-24, 191. Despite Mother's expressed continued fear of violence from Father and her assertion that he violated the existing PFA in the case, Mother declined to proceed against Father. *See id*. at 131-32.

Mother's mental health increasingly became a concern for CYF and the court. In 2019, she received a diagnosis of bipolar disorder, post-traumatic stress disorder ("PTSD"), persecutory delusion disorder, generalized anxiety disorder, attention deficit hyperactivity disorder ("ADHD"), opioid use disorder, and cannabis use disorder. *See id*. at 48, 52, 110. Mother took several medications in connection with these diagnoses. *See id*. at 12-13,

25.    Mother unilaterally ceased participating in medical or psychological treatment after May 2022.  **See id**. at 12-13, 25.

In August 2021, Mother stated that Child, then three years old, could make her own medical and dental decisions, which resulted in the court appointing Grandmother as Child's medical decisionmaker.  **See id**. at 57-59, 114, 207-08.  From March 2022 onward, Mother's mental health decline continued to accelerate:  she insisted that her case file was fabricated and her case should be closed, sent rambling, unpunctuated texts to CYF, and evinced a lack of mental stability.  **See id**. at 194-96, 200, 202.  Also in March 2021, CYF determined that Mother had made no progress toward her mental health goals and adopted concurrent goals of reunification and adoption.  **See id**. at 148, 180.  In April 2022, CYF visited Mother's apartment and found that she placed her bed in her living room.  Mother explained that the living room was the best place to be if someone broke into her apartment.  **See** N.T., 9/12/22, at 183.  At that meeting, Mother exhibited paranoia, claimed that her mail was being stolen and the Freemasons were acting against her, and had great difficulty focusing.  **See id**. at 53-56, 193; **see also** N.T., 10/17/22, at 34-35.  Mother had continued to visit Child even after the court's May 2020 order that their meetings be supervised after she threatened to abscond with Child. **See id**. at 109.  However, after April 2022, Mother made only one or two visits to Child claiming that she had work responsibilities, which CYF was unable to corroborate.  **See id**. at 111, 151-52, 204-06.

The Orphans' Court issued an order in June 2022 stating that Mother "continues to have moderate to severe behaviors that are a manifestation of her mental health because she has refused to engage in meaningful mental health treatments, the primary and substantial barrier keeping her from reunification with [Child]," and stated that Mother had made no progress toward alleviating the circumstances that led to the initial placement. *See id*. at 147, 176-77, 199-200.

Since May 2022, Mother has repeatedly stated that she does not need mental health treatment, does not have mental health issues, and that CYF forced treatment upon her. *See id*. at 140-44, 147. Mother has also stated that CYF is trafficking and making money off of Child. *See id*. at 144.

Mother's CYF caseworkers testified that termination of Mother's parental rights was in Child's best interest because neither Mother nor Father had made progress in resolving the reasons that led to the initial placement and Grandmother, with whom Child had a strong bond and who wants to adopt Child, expressed willingness to maintain Child's relationship with Mother and paternal grandparents. *See* N.T, 9/12/22, at 165-66.[3] One of Mother's CYF caseworkers testified that termination of Mother's parental rights would not

_____

[3] CYF caseworkers have observed that Child and Grandmother have a great relationship, and that Grandmother meets all of Child's physical, medical, educational, and developmental needs, and has shielded Child from the worst of Mother's behavior. *See* N.T., 9/12/22, at 208-14. The trial court clarified with CYF that if it were to terminate Mother's parental rights, the permanency plan would be for Grandmother to adopt Child. *See* N.T., 10/17/22, at 46.

- 5 -

have a detrimental effect on Child because Grandmother has such a strong and significant bond with Child, will always make Mother welcome, and Child will continue to thrive with Grandmother. ***See id***. at 215-16.

Mother testified that Child's removal from her home was "rigged," and that materials from her file had been suppressed. ***See*** N.T., 10/17/22, 6, 9, 10, 11-12. Mother stated that the court was "whisper[ing] in my mother's ear and try to divide me and conquer and cause chaos and get my mom to hate me and me to hate her. . .." ***See id***. at 21-22. She stated that she needed to be with Child for her mental health to improve. ***See id***. at 22. Mother also declared that CYF had manipulated Grandmother and another person who used the money she made from that process to pay for her wedding. ***See id***. at 23. Mother declared, "There's nothing wrong with my mental health. You keep playing mental." ***See id***. at 32-33. At the end of a lengthy, passionate declaration in which she criticized the previous judge in the case, Mother declared, "[F]reewill is dead like that. The governments are taking over. They think they have the power. This is crazy. Like I have every - - I had all proof . . .. Every one of my witnesses . . . [t]hey don't see why I need all this supervision. It's because it was being tacked on me to try to break me . . .." ***See id***. at 38-43.

On August 12, 2021, CYF filed a petition for the involuntary termination of Mother's (and Father's) parental rights pursuant to 23 Pa.C.S.A.

§ 2511(a)(2), (5), (8), and (b).[4] The Orphans' Court held evidentiary hearings on September 12 and October 17, 2022, respectively, at which CYF presented the testimony of Dr. Muhammad Shaikh, the psychiatrist who had monitored Mother's medication, Dr. Beth Bliss, an expert psychologist who observed Mother and Child and prepared a report,[5] Kaitlyn Joyce, the CYF caseworker who supervised this case from October 2019 through February 2021, and Shante Washington, the CYF caseworker who supervised this case beginning in approximately 2021. On October 19, 2022, the Orphans' Court filed an order involuntarily terminating Mother's parental rights.

Mother filed a timely notice of appeal to this Court along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Thereafter, the Orphans' Court submitted a responsive opinion pursuant to Rule 1925(a)(2)(ii).

_____

[4] On December 2, 2021, the Orphans' Court appointed KidsVoice to represent Child's interests at the proceeding. Child's counsel filed a brief in this Court advocating affirmance of the October 2022 order that terminated Mother's parental rights.

[5] Dr. Bliss's report was entered as an exhibit at the September 12, 2022 hearing without objection. *See* N.T., 9/12/22, at 40. Mother has failed to comply with her responsibility to include the report in the certified record and ensure that this Court is supplied with a "complete record for purposes of review." *Smith v. Smith*, 637 A.2d 622, 623 (Pa. Super. 1993). Such an oversight may result in waiver if it impedes our review of the case. *See Rosselli v. Rosselli*, 750 A.2d 355, 359-60 (Pa. Super. 2000). The absence of that report does not impair our ability to review the case.

Mother raises two issues for our consideration:

1. Did the [Orphans'] [C]ourt abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), and (8)?

2. Did the [Orphans'] [C]ourt abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of [Child] pursuant to 23 Pa.C.S.A. § 2511(b)?

Mother's Brief at 6 (internal citations clarified).

In cases concerning the involuntary termination of parental rights, "appellate review is limited to a determination of whether the termination court's decree is supported by competent evidence." **In re Adoption of C.M.**, 255 A.3d 343, 358 (Pa. 2021) (citation omitted). In conducting this review, an appellate court must accept the orphans' court's findings of fact and credibility determinations so long as they are supported by the underlying record. **See Interest of S.K.L.R.**, 256 A.3d 1108, 1123 (Pa. 2021). Where the Orphans' Court's factual findings are supported by the evidence, an appellate court may not disturb that ruling absent an error of law or abuse of discretion. **See In re Adoption of L.A.K.**, 265 A.3d 580, 591 (Pa. 2021). An abuse of discretion "does not result merely because the reviewing court might have reached a different conclusion," but "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." **Interest of M.E.**, 283 A.3d 820, 829-30 (Pa. Super. 2022) (citation and quotations

omitted). This standard "reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings." *Id.* at 830.

In considering the propriety of terminating an individual's parental rights, the Orphans' Court must balance a parent's fundamental "right to make decisions concerning the care, custody, and control" of her child with the "child's essential needs for a parent's care, protection, and support." *In re Adoption of C.M.*, 255 A.3d at 358 (citation omitted). Severing of parental rights can have "significant and permanent consequences for both the parent and child." *In re Adoption of L.A.K.*, 265 A.3d at 591. Accordingly, the moving party must establish the statutory grounds for termination by "clear and convincing evidence, which is so "direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Interest of M.E.*, 283 A.3d at 830 (citation and quotations omitted). Finally, we also remain mindful that "a parent's basic constitutional right to the custody and rearing of [her] child is converted, upon the failure to fulfill [her] parental duties, to the child's right to have proper parenting and fulfillment of [her] potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004).

Termination of parental rights is governed by 23 Pa.C.S.A. 2511 ("the Adoption Act"). In pertinent part, the statute provides as follows:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for h[er] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * * *

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S.A. § 2511(a)(2), (b).  Grounds for termination pursuant to section 2511(a)(2) are not limited to affirmative misconduct but concern parental incapacity that cannot be remedied.  *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021).  "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties."  *Id* (citation omitted).  Extended relegation of a child to the care of others as a result of parental incapacity is relevant to determining whether a child has been without essential parental care or control.  *See In re Adoption of Sabrina*, 472 A.2d 624, 627 (Pa. Super. 1984).

Our precedent has interpreted section 2511 as requiring a "bifurcated process" prior to the termination of parental rights:

Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for

- 10 -

termination delineated in [s]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of . . . [her] parental rights does the court engage in the second part of the analysis pursuant to [s]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re B.J.Z.*, 207 A.3d 914, 921 (Pa. Super. 2019) (internal citation omitted).

In order to affirm an order of termination, we need only agree with the Orphans' Court's assessment as to any one subsection set forth at section 2511(a), as well as the requirements of section 2511(b). *See id*. at 922. The Orphans' Court determined that Mother's conduct warranted termination pursuant to section 2511(a)(2), (5), and (8), and that terminating her parental rights served Child's needs and welfare pursuant to section 2511(b). Our analysis will focus solely upon section 2511(a)(2) and (b).

Relevant to section 2511(a)(2),[6] Mother asserts that she either completed her goals or would do so within a reasonable period of time, received mental health and substance abuse treatment, and could provide essential parental care to Child. *See* Mother's Brief at 22-25.

The Orphans' Court stated in its Opinion that Mother made little to no progress in her mental health treatment, has repeatedly stated that she does not need it or believe in it, and any mental health issues she has are the result

---

[6] Mother does not subdivide her issue concerning sections 2511(a)(2), (5), and (8) by individual subsection.

of not having Child. ***See*** Orphans' Court Opinion, 12/22/22, at 14-15. The court also cited Mother's outbursts throughout the hearings, and her inability to function at a level that would allow her to care for Child on a day-to-day or long-term basis. ***See id***. Finally, the court stated that no witness testified that Mother had made any meaningful progress on her mental health goals, other than Mother, whom the court found not credible. ***See id***.

Our review of this case reveals ample record support for the Orphans' Court's conclusions. Dr. Beth Bliss, an expert in psychology, child psychology, and forensic psychology, testified that she evaluated Mother, Grandmother, and Child, and prepared a report on her findings. ***See*** N.T., 9/12/22, at 38-39. Dr. Bliss noted that Mother was "extremely tangential and difficult to redirect" and became "belligerent and angry" at multiple junctures. ***See id***. at 40-41, 60. Despite Mother's lack of cooperation, Dr. Bliss was able to diagnose Mother as having, *inter alia*, a persecutorial delusion disorder, which caused Mother to regularly devolve into tangents that went beyond mere anger at the system and concerned allegations of an intricate government conspiracy. ***See id***. at 54-56. Dr. Bliss found that Mother "has great difficulty comporting her behavior and focusing on anything other than these delusions and her anger." ***Id***. at 59-60.[7] Dr. Bliss reported that Mother was unable to

---

[7] The court removed Mother from the courtroom when she interposed repeated outbursts during testimony, including an explicative-laden interjection as Dr. Bliss testified. ***See*** N.T., 9/12/22, at 54-55. Mother
*(Footnote Continued Next Page)*

control her outbursts in Child's presence and lacked awareness of "how her outbursts might be affecting [Child]." *Id*. at 62-63.

Dr. Bliss also emphasized that Mother's delusions had serious implications for broader concerns such as Child's education, healthcare, and safety. *Id*. at 57-60. Specifically, Dr. Bliss expressed concern that Mother would refrain from contacting child protective services or the police in the future if there was a concern for safety and would fail to take her to a doctor or emergency room if necessary. *Id.* at 59, 73, 90. Dr. Bliss found Mother has a substantial inability to "put aside her own emotions . . . in order to be there for [Child] and meet the needs of [Child]." *See id*. at 67

Dr. Bliss opined that Mother would not be able to care for Child in the near future and would only be able to do so in the future if she received extensive treatment to acknowledge and work on her delusions and paranoia and increased her visits with Child significantly, "but . . . that's a lot of ifs." *See id*. at 74. Given Mother's current level of functioning, Dr. Bliss believed Mother would not be amenable to the necessary treatment, and even if she were willing to work diligently, it would take more than six months for her to make the necessary progress. *See id*. at 66, 74-75, 77. At the time of the involuntary termination hearings, Child had been in care for thirty-five of her fifty-two months of life. *See id*. at 76, 105-06. Dr. Bliss testified that

repeated her intemperate conduct on the second day of the hearing. *See* N.T., 10/17/22, at 49-50, 51, 52, 53, 58, 59, 60, 61.

termination would only cause harm to Child if she were never to see or talk to Mother again, **see id**. at 88, but that harm could be outweighed by the security and benefits of permanency and adoption, particularly because Grandmother, if permitted to adopt Child, has stated that she will continue to allow Mother to have ongoing contact with Child. **See id**. at 92, 207.

Mother's testimony and outburst during the hearings lent support to Dr. Bliss's opinion. Mother accused CYF of manipulating her family and declared that "freewill is dead" since "[t]he governments are taking over." **See** N.T., 10/17/22, at 6, 23 34-35, 38-43. Concerning her mental health, Mother testified that therapy was not necessary and that, "There's nothing wrong with my mental health. You keep playing mental. You guys keep playing saying mental because it's just to keep – put words in, to keep it in people's ears[.]" **Id**. at 11, 32-33.

Based on the foregoing, the record supports the Orphans' Court's conclusions that Mother continued to have mental health impairments that rendered her incapable of providing parenting to Child and her incapacity cannot and will not be remedied. This Court has previously found grounds for termination under analogous circumstances. **See**, **e.g.**, **In re Adoption of A.H.**, 247 A.3d at 444 (finding appropriate grounds for termination pursuant to section 2511(a)(2) where a parent who had been diagnosed with incapacitating mental health conditions manifested an "outright refusal to cooperate" with directives to seek and confirm treatment and made

"insufficient progress" over the course of more than two years). Thus, no relief is due on Mother's first appellate issue.

Mother's second issue asserts that the Orphans' Court erred in concluding that termination of her parental rights would serve Child's needs and welfare. *See* Mother's Brief at 25-28. Mother cites Dr. Bliss's testimony that "termination is not the correct outcome for this family because of the strong desire that [Child] has for contact with her Mother." *Id*. at 27. The Orphans' Court determined that termination of Mother's parental rights served Child's needs and welfare. *See* Orphans' Court Order, 10/19/22.[8]

Our review pursuant to section 2511(b) "focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re B.J.Z.*, 207 A.3d at 921-22 (citation omitted). We must "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *In re A.H.* 247 A.3d at 445 (citation omitted). "Importantly, the question is not merely whether a bond exists, but whether termination would destroy this existing, necessary and beneficial relationship." *Id*. at 445 (citation omitted). Additionally, this inquiry must also focus upon various supplemental "[i]ntangibles such as love, comfort, security, and stability[.]" *Id*. at 444 (internal citation and quotations omitted). Furthermore,

---

[8] The Orphans' Court did not articulate the basis for this finding in its Rule 1925(a) Opinion.

"[c]ommon sense dictates that courts considering termination must also consider whether the child[] [is] in a pre-adoptive home and whether [she has] a bond with [her] foster parents." *In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013) (citation omitted). The strength of emotional bond between a child and a potential adoptive parent is also an important consideration" in a section 2511(b) "best interests" assessment. *See In re I.J.*, 972 A.2d 5, 13 (Pa. Super. 2009).

At the time of the involuntary termination hearings, Child was four years old and had been in Grandmother's custody for approximately three years. In her observations of Child and Mother, Dr. Bliss recognized that a bond exists between the two. *See* N.T., 9/12/22 at 69. However, Dr. Bliss found the overall level of attachment between Child and Mother to be "insecure" and "[s]omewhat limited." *Id*. at 65-69, 88. Dr. Bliss described Mother's interactions with Child as "quite low in energy" and not matching Child's level of enthusiasm. *See id*. at 66 (Dr. Bliss testifies that in one instance, "[Mother] was interacting appropriately, there wasn't anything negative, but it wasn't positive either. There wasn't a lot of energy. There wasn't a lot of attention and she wasn't matching what [Child] was seeking."). Dr. Bliss identified Grandmother as Child's "psychological parent," *i.e.*, the person with whom Child had developed a secure parental bond. *Id*. at 71 (also stating that the secure attachment is to . . . [G]randmother, which would be what you would equate to a psychological parent."). In contrast to Mother, Dr. Bliss reported

that Grandmother fully reciprocated Child's need for attention and direction. *See id*. at 70.

Further, although Dr. Bliss stated a preference for permanent legal custody arrangement in lieu of termination, she ultimately conceded that Child's need for permanency after three years was a more important consideration with respect to Child's welfare:

> Q.   And what do you make of [Child's] needs for permanency at this time, having been in care for that period of time?
>
> A.   She needs permanency. It would help her to continue to have secure attachments and to develop in healthier ways. I had stated in my report that I don't believe that termination of parental rights is the correct thing because of the strong desire that [Child] and her mother have for contact with one another. **However, I do believe that permanency is the appropriate step at this point**.

*Id*. at 76-77 (emphasis added). Dr. Bliss further testified that Child would suffer harm if she were never allowed to see or talk to Mother again, *see id*. at 88-89, but averred that Grandmother's ability to provide for Child's needs for permanency and stability could outweigh these concerns:

> Q.   [W]ould you say that the harm that would occur should [Child] never have contact with [Mother] again could be out weighed [sic] by the security and benefits that permanency and adoption could provide?
>
> A.   Yes, it could be.
>
> Q.   Okay. And would you say that the limited bond and insecure attachment to [Child] is currently healthy, beneficial or necessary to her?
>
> A.   The way that it currently is, no.

*Id*. at 91-92.[9]

Based on the foregoing, we discern no abuse of discretion in the Orphans' Court's conclusion that Mother and Child did not have a healthy bond and termination of Mother's parental rights would serve Child's developmental, physical, and emotional needs and welfare pursuant to section 2511(b). Thus, severing Mother's parental rights will not cause detrimental effects to Child. *See In re D.A.T.*, 91 A.3d 197, 208 (Pa. Super. 2014) (holding termination was appropriate where the foster parents provided the child's "main sources of love, comfort, stability and security," foster parents and birth parent was unable to meet child's "emotional, physical, and developmental needs," and had not been able to do so for almost two years prior to the termination hearing). Accordingly, we affirm the order involuntarily terminating Mother's parental rights.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/5/2023

---

[9] Dr. Bliss also reported Grandmother "would always be open" to Mother having contact with Child, post-adoption, and that Grandmother averred she was supportive of Mother's visits with the child. *See* N.T., 9/12/22, at 81-82.